# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-2682

ROBERT BINTZ,

*Petitioner-Appellant*,

v.

DANIEL BERTRAND,

*Respondent-Appellee.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03 C 0574—**Lynn Adelman**, *Judge.*

_____

ARGUED JANUARY 11, 2005—DECIDED APRIL 7, 2005

_____


Before POSNER, MANION, and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* Robert Bintz and his brother, David Bintz, were convicted, in separate Wisconsin state court proceedings, of murdering a bartender, Sandra Lison. After failing in his state appellate challenge to his conviction, Robert sought habeas corpus relief in the United States District Court for the Eastern District of Wisconsin, asserting that the state courts improperly allowed hearsay statements to be used against him at trial. The Eastern District denied the petition for writ of habeas corpus, and Robert appeals. We affirm.

I

Sandra Lison was last seen alive tending bar at the Good Times bar ("Good Times") in Green Bay, Wisconsin on August 3, 1987. Her body was later discovered in a forest.

As part of the initial investigation into Lison's murder in 1987, Green Bay Police Detective Lawrence Pamperin took a statement from David Bintz (the "Pamperin Statement") in which David admitted that he and his brother Robert Bintz had visited Good Times the day of Lison's disappearance. David stated that he had driven Robert and a friend to Good Times to buy a case of beer that evening. David waited in the car while they went inside. After they returned home, David became upset with the price charged for the beer and called Good Times, threatening to blow it up. David told Pamperin that he subsequently passed out. No one was charged at that time with Lison's murder.

Over ten years later, in 1998, David was in prison at the Oshkosh Correctional Institution for an unrelated crime. His cellmate, Gary Swendby, heard David talk in his sleep about killing someone. In particular, David shouted "make sure she's dead." Swendby asked David about the nocturnal shouts, and David responded that he had been involved in Lison's murder. David told Swendby that he and Robert had decided to rob Good Times for overcharging them on beer, then decided to kill Lison after realizing that she could identify them. David further stated that he repeatedly commanded his brother to make sure that Lison was dead, confiding to Swendby that they disposed of the body "up north."

After hearing David's story, Swendby went to prison officials with news of David's involvement in Lison's murder. Prison officials contacted the Green Bay Police Department, which interviewed Swendby and other inmates regarding

David's comments about the murder. Eventually, Green Bay Police Detective Robert Haglund confronted David with Swendby's statement, and David confirmed that it was true (the "Haglund Admission"). David also supplied Haglund with additional facts about Robert beating and strangling Lison. David, however, said that he (David) did not kill anyone.

Both brothers were charged with the murder of Lison. A joint preliminary hearing was held, though David and Robert were then tried separately. In May 2000, David went to trial, and Swendby testified against him. David was convicted of first-degree murder.

At Robert's trial in July 2000, David was called to testify, but invoked his Fifth Amendment right against self-incrimination. The court concluded that David was unavailable because of his assertion of the Fifth Amendment, and allowed David's statements to Swendby, Haglund, and Pamperin into evidence as "statement against penal interest" exceptions to the hearsay rule. Swendby had been killed in an automobile accident between the trials. The court concluded that Swendby, like David, was an unavailable witness and admitted his testimony from David's trial and the joint preliminary hearing. Other inmates from Oshkosh also testified that David had made comments to them about the murder (the "Oshkosh Testimony"). The court decided that none of this evidence impinged upon Robert's rights under the Confrontation Clause of the Sixth Amendment to the Constitution ("Confrontation Clause"). In addition, at trial the prosecution offered evidence from Joan Andrews, a former girlfriend who testified that Robert spontaneously spoke to her about the murder. During a car ride with Andrews, Robert recounted that he and his brother felt Lison move in the back of the car while David was driving. Like his brother, Robert was convicted of murder.

In 2001, Robert appealed his conviction to the Wisconsin Court of Appeals, claiming that the introduction of the Pamperin Statement and Swendby's testimony, particularly comments from David to Swendby, violated Robert's Confrontation Clause rights because he had no opportunity to cross-examine David or Swendby. The Court of Appeals disagreed and affirmed the conviction in 2002, analyzing the challenge under the framework provided by the United States Supreme Court in *Ohio v. Roberts*, 448 U.S. 56 (1980), and *Lilly v. Virginia*, 527 U.S. 116 (1999) (plurality opinion). Robert then appealed to the Wisconsin Supreme Court. In his petition to the Wisconsin Supreme Court, Robert only argued two violations of the Confrontation Clause: (1) the Pamperin Statement; and (2) David's statements to Swendby introduced through Swendby at David's trial. The Wisconsin Supreme Court declined review.

In June 2003, Robert filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Wisconsin, pursuant to 28 U.S.C. § 2254. Before the district court, Robert challenged the Oshkosh Testimony, as well as the previously challenged statements of David and Swendby. After the initial briefs were filed, the United States Supreme Court issued its decision in *Crawford v. Washington*, 124 S.Ct. 1354 (2004), which addressed the continuing validity of the *Roberts/Lilly* framework for Confrontation Clause analysis. Robert then filed a supplemental brief in the district court regarding the applicability of *Crawford*. The district court denied the habeas petition. It first found that Robert had procedurally defaulted on his challenge to the Oshkosh Testimony. The district court further concluded that *Crawford* did not apply at the time of the state court rulings and that the introduction of the statements from David and Swendby did not violate the then-applicable Supreme Court precedent regarding the Confrontation Clause. Robert appeals.

## II

## A

Before addressing Robert's Confrontation Clause argument, we must first determine what statements are actually at issue. In his brief before this court, Robert objects to four pieces of evidence offered at trial: (1) the Pamperin Statement; (2) Swendby's previous testimony concerning statements from David to Swendby about the murder; (3) the Haglund Admission; and (4) the Oshkosh Testimony.[1] The State of Wisconsin contends that Robert has procedurally defaulted on any challenges to the latter two statements by failing to raise these objections at every level of the state court proceedings.

According to 28 U.S.C. § 2254(b)(1)(A), a habeas petition shall not be granted unless the petitioner "has exhausted the remedies available in the courts of the State." The petitioner must establish that he fully and fairly presented his claims to the state appellate courts, thus giving the state courts a

---

[1] This footnote compiles the statements at issue for ease of reference.

- Pamperin Statement: David Bintz's 1987 comments to Detective Pamperin regarding his activities on the night of Lison's murder.

- Haglund Admission: David Bintz's 1998 statement to Detective Haglund confirming Swendby's statement that David had admitted to being involved in Lison's murder.

- Swendby's testimony: Testimony by Swendby at David Bintz's trial regarding comments David made to Swendby about Lison's murder.

- Oshkosh Testimony: Testimony by Oshkosh inmates at David Bintz's trial regarding comments David made to them about Lison's murder.

meaningful opportunity to consider the substance of the claims that he later presents in his federal challenge. *See, e.g., Harris v. McAdory*, 334 F.3d 665, 668 (7th Cir. 2003). Fair presentment requires that the petitioner assert his claims through one complete round of state court review. *See, e.g., Lewis v. Sternes*, 390 F.3d 1019, 1025-26 (7th Cir. 2004). In the state courts, the petitioner must present both the operative facts and legal principles that control each of his claims. *See Rittenhouse v. Battles*, 263 F.3d 689, 695-96 (7th Cir. 2001). "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Lewis*, 390 F.3d at 1026. If a petitioner has procedurally defaulted his claim,

> he may obtain federal habeas relief only upon a showing of cause and prejudice for the default or upon a showing that a failure to grant him relief would work a fundamental miscarriage of justice. A fundamental miscarriage of justice occurs when "a constitutional violation has probably resulted in the conviction of one who is actually innocent."

*Moore v. Casperson*, 345 F.3d 474, 484 (7th Cir. 2004) (quoting *Thomas v. McCaughtry*, 201 F.3d 995, 999 (7th Cir. 2000)). Cause for a default is ordinarily established by showing that some external obstacle prevented the petitioner from presenting his claim to the state courts. *See Lewis*, 390 F.3d at 1026.

Against this backdrop, we consider whether Robert defaulted on his Confrontation Clause challenges related to the Haglund Admission and the Oshkosh Testimony. In Robert's initial brief on direct appeal to the Wisconsin Court of Appeals, he only referenced the Haglund Admission once and did not present any argument regarding its admissibil-

ity. In its response brief in the direct appeal, Wisconsin specifically pointed out that Robert did not challenge the Haglund Admission. Robert neither challenged this characterization nor introduced this issue in his reply brief in the state appellate court. Likewise, he did not address the Haglund Admission in his petition for review to the Wisconsin Supreme Court. Accordingly, Robert failed to fully and fairly present this issue to the Wisconsin courts, and so procedurally defaulted on any claim relating to the Haglund Admission.

Robert still could qualify for habeas relief regarding the Haglund Admission if he could establish cause for the procedural default or a fundamental miscarriage of justice. Robert, however, has shown neither an external impediment that led to the procedural default nor that the procedural default would cause a fundamental miscarriage of justice. Robert states in his reply brief that failure to consider the constitutionality of the Haglund Admission would result in a fundamental miscarriage of justice, but fails to develop this argument or show that he was actually innocent. His conclusory statement is insufficient to obtain habeas relief. Robert cannot avoid the effects of the procedural default of his claim relating to the Haglund Admission.[2]

Robert's challenge to the Oshkosh Testimony encounters similar, though not identical, problems. The district court found procedural default regarding the Oshkosh Testimony, a ruling that we review *de novo. See Lewis*, 390 F.3d at 1025.

---

[2] It also appears that Robert failed to challenge the Haglund Admission before the district court, making only a few general references to it. This would constitute an independent ground barring Robert from pursuing his claim. *See Winsett v. Washington*, 130 F.3d 269, 273 (7th Cir. 1997) ("Normally, a party waives those issues it fails to raise in the district court.").

It appears that Robert did raise this issue in his initial brief before the Wisconsin Court of Appeals. Robert, however, never presented the Oshkosh Testimony to the Wisconsin Supreme Court in his petition for that court to review the decision of the Wisconsin Court of Appeals. While the Wisconsin Supreme Court denied his petition for review, Robert was still required to present the issue to it. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) ("Boerckel's failure to present three of his federal habeas claims to the Illinois Supreme Court in a timely fashion has resulted in a procedural default of those claims"); *Moore*, 345 F.3d at 485-86 (Wisconsin Supreme Court's discretion to grant judicial review is similar to that of the Illinois Supreme Court, and *Boerckel* requires presentation of all issues to that court). Robert does not argue either cause for his procedural default or that the procedural default would cause a fundamental miscarriage of justice. As Robert failed to properly exhaust his state remedies, he has procedurally defaulted his challenge to the Oshkosh Testimony.

B

Having removed the underbrush, we now turn to Robert's remaining argument—that two pieces of evidence introduced at trial violated Robert's rights under the Confrontation Clause, entitling him to habeas relief. "In an appeal from a ruling on a petition for habeas relief, we review the district court's findings of fact for clear error and its rulings on issues of law *de novo*." *Denny v. Gudmandson*, 252 F.3d 896, 900 (7th Cir. 2001). To qualify for habeas relief, Robert must show that the state court proceedings adjudicating his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

### 1. Consideration of New Supreme Court Decisions

As a general matter, we look at the Supreme Court's holdings as of the time of the relevant state court decision to determine clearly established federal law. *See Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). The Supreme Court prohibits analyzing the reasonableness of a state court determination in light of a "new" Supreme Court rule propounded after the state court made its decision. *See Teague v. Lane*, 489 U.S. 288, 301 (1989).

> In general, . . . a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. . . . To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

*Id.* (emphasis in original). *Teague* does allow two types of new rules as "exceptions" to its bar: "(1) new rules that place certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, and (2) rules that define procedure implicit in the concept of ordered liberty." *Mankarious v. United States*, 282 F.3d 940, 943 (7th Cir. 2002).[3] A new rule qualifies for the latter exception (and applies retroactively) if it is a watershed rule that implicates the fundamental fairness and accuracy of the criminal proceeding. *See Spreitzer v. Peters*, 114 F.3d 1435, 1448 (7th Cir. 1997); *Lambert v. McBride*, 365 F.3d 557, 562 (7th Cir. 2004).

---

[3] "Rules that fall within what we have referred to as *Teague*'s first exception 'are more accurately characterized as substantive rules not subject to [*Teague*'s] bar.' " *Beard v. Banks*, 124 S.Ct. 2504, 2510 n.3 (2004) (quoting *Schriro v. Summerlin*, 124 S.Ct. 2519, 2523 n. 4 (2004)).

*2. Application of Teague Principles to Crawford*

Robert contends that we should review his state court conviction in light of the Confrontation Clause principles regarding hearsay statements of unavailable witnesses announced by the Supreme Court in *Crawford v. Washington*, 124 S.Ct. 1354 (2004). As the Supreme Court decided *Crawford* after the Wisconsin Supreme Court denied Robert's petition for review, we begin by determining whether *Crawford* announced a new rule according to *Teague* and its progeny.[4] We first examine the state of Supreme Court Confrontation Clause jurisprudence before *Crawford* and decide whether *Crawford* was a departure from the precedent. This is the first time that this issue has been directly presented for ruling in this circuit. *See Owens v. Frank*, 394 F.3d 490, 501 n. 8 (7th Cir. 2005) (expressly reserving the question of whether *Crawford* should be applied retroactively).

The Confrontation Clause guarantees an accused the right "to be confronted with the witnesses against him." U.S. Const. Amend. VI; *Pointer v. Texas*, 380 U.S. 400, 403 (1965) (applying Sixth Amendment to the States by virtue of the Fourteenth Amendment). Prior to *Crawford*, the Supreme Court authorized the introduction of hearsay statements against a criminal defendant in certain circumstances. By their nature such statements do not afford the opportunity for cross-examination of the person who made them. *See*

---

[4] "A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Spreitzer v. Peters*, 114 F.3d 1435, 1442 (7th Cir. 1997) (quoting *Stewart v. Lane*, 60 F.3d 296, 300 (7th Cir. 1995)). The Wisconsin Supreme Court denied Robert's petition for review on October 21, 2002.

*Roberts*, 448 U.S. at 65-68. In *Roberts*, the Supreme Court noted the Framers' preference for face-to-face accusation, but carved an exception to allow the introduction at trial of statements from witnesses who were unavailable to testify. *See id.* at 65-66. The Supreme Court held that if a hearsay declarant is found to be unavailable at trial, his statement still can be admissible if: (1) it bears adequate "indicia of reliability" by falling within a firmly rooted hearsay exception; or (2) it contains "particularized guarantees of trustworthiness." *Id.* at 66.

In 1999, the Supreme Court confirmed that the general framework of *Roberts* remained valid. *See Lilly*, 527 U.S. at 124-25. In that case, the Supreme Court determined that a statement against penal interest, which incriminated both the declarant and the defendant, did not constitute a firmly rooted exception to the hearsay bar under the first prong of *Roberts*. *See id.* at 134. The Supreme Court was concerned about a declarant who, under police interrogation, inculpated himself to a minor extent, while shifting the bulk of the blame to the defendant. *See id.* at 121. Moving to the second prong of the *Roberts* analysis, the Supreme Court decided that Virginia had not offered sufficient particularized guarantees of trustworthiness. *See id.* at 138-39. Therefore, the hearsay statements were inadmissible. *See id.* at 139-40. *Lilly*, however, did not fundamentally disturb either the *Roberts* framework or disrupt its ruling that an unavailable declarant's statements could be used at trial in certain circumstances.

In 2004, however, *Crawford* overruled *Roberts*. *See Crawford*, 124 S.Ct. at 1374. The Supreme Court held that the Confrontation Clause required that testimonial statements from witnesses absent from trial should be admitted only when the declarant is unavailable and the defendant had a prior opportunity to cross-examine. *See id.* The Supreme

Court concluded that the *Roberts* test departed from this principle by allowing a "jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability." *Id.* at 1370. "The unpardonable vice of the *Roberts* test, however, is . . . its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude." *Id.* at 1371.

It seems clear that *Crawford* was a clean break from the line of precedent established by *Roberts*. *Crawford* considered and rejected the continuing application of *Roberts*. Nevertheless, a state court would not have acted unreasonably by failing to anticipate this ruling and applying *Roberts*. *See O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) ("At bottom, the *Teague* doctrine 'validates reasonable good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions.' ") (citations omitted). *Crawford* was thus a new rule for purposes of *Teague*.

This conclusion does not end the *Teague* analysis, however. We must also determine whether *Crawford* might apply retroactively based on the two exceptions to the *Teague* rule. *See Teague*, 489 U.S. at 307, 310. Regarding the first, *Crawford* does not place certain types of conduct outside of the criminal law-making power to punish, and, therefore, the only issue is whether *Crawford* announced a watershed rule implicating the fundamental fairness and accuracy of the criminal proceeding.

In *Teague*, the Supreme Court limited this exception to "those new procedures without which the likelihood of an accurate conviction is seriously diminished." *Teague*, 489 U.S. at 313. The example that the Supreme Court has used for this exception is *Gideon v. Wainwright*, 372 U.S. 335, 343 (1963), which established an affirmative right to counsel in

felony cases. *See O'Dell*, 521 U.S. at 167. "And, because any qualifying rule 'would be so central to an accurate determination of innocence or guilt [that it is] unlikely that many such components of basic due process have yet to emerge,' it should come as no surprise that we have yet to find a new rule that falls under the second *Teague* exception." *Beard*, 124 S.Ct. at 2513-14 (internal citations omitted).

*Crawford* does not rise to this level. While important, it does not introduce any fundamentally new concepts to address the fairness or accuracy of a trial; instead it calls for a complete implementation of a protection that already exists—the Confrontation Clause. Further, it is unclear that *Crawford*'s modification to the hearsay rules will markedly improve the accuracy of convictions. *See Mungo v. Duncan*, 393 F.3d 327, 335-36 (2d Cir. 2004) (noting that, while some inaccurate evidence will be barred under the new rule, "*Crawford* also precludes admission of highly reliable testimonial out-of-court statements that would have been admissible under the old rules."). *Crawford* is not a guarantee of accuracy, but an extension of the full constitutional protections of the Sixth Amendment. While the two concepts overlap, they are not synonymous. *Crawford*, therefore, is not a watershed change for purposes of the second *Teague* exception and does not apply retroactively.[5]

---

[5] We are not alone in reaching this conclusion. *See Brown v. Uphoff*, 381 F.3d 1219, 1227 (10th Cir. 2004) ("We conclude that *Crawford* is not a watershed decision and is, therefore, not retroactively applicable to Brown's initial habeas petition."); *Mungo v. Duncan*, 393 F.3d 327, 336 (2d Cir. 2004) ("we conclude that *Crawford* is not a watershed rule.")

### 3.   *Analysis under pre-Crawford Confrontation Clause Precedent*

We proceed, therefore, to analyze Robert's Confrontation Clause claims according to *Roberts* and *Lilly*, the clearly established Supreme Court precedent at the time of the state court decisions.[6] Robert first challenges the introduction of the Pamperin Statement at his trial. At the time of Robert's trial, an accomplice's confession inculpating a criminal defendant did not qualify as a firmly rooted hearsay exception, so the statement had to bear particularized guarantees of trustworthiness to be admissible. *See Lilly*, 527 U.S. at 135.

Particularized guarantees of trustworthiness exist if the totality of the circumstances surrounding the statement indicate that the statement is "so trustworthy that adversarial testing would add little to its reliability." *Idaho v. Wright*, 497 U.S. 805, 821 (1990). The Supreme Court declined to endorse a mechanical test to determine the particularized guarantees of trustworthiness for purposes of the Confrontation Clause. *See id.* at 822. The Supreme Court has previously stated that "the very fact that a statement is genuinely self-inculpatory . . . is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause." *Williamson v. United States*, 512 U.S. 594, 605 (1994). Additionally, a high level of detail in a statement and the "absence of any offer of leniency" undercut a motive to lie and provide assurances of trustworthiness. *See Brown v. Uphoff*, 381 F.3d 1219, 1228 (10th Cir. 2004).

---

[6] Robert also asks this court to reconsider whether the AEDPA effectively codified *Teague* and its exceptions, but fails to give any reason why we should disturb our ruling in *Gosier v. Welborn*, 175 F.3d 504, 510 (7th Cir. 1999). Therefore, we will not do so.

In this case, the Pamperin Statement contained the required particularized guarantees of trustworthiness to satisfy the post-*Lilly* Confrontation Clause analysis. First, David actually inculpated himself in the Pamperin Statement. While the Pamperin Statement did not contain any admissions regarding the murder, it was genuinely self-inculpatory for David in that it placed him at the murder scene several hours before the murder. This is precisely the same evidence that Robert opposes based on its inculpatory value for him. The Pamperin Statement, however, had an even greater inculpatory effect for David, as he also admitted calling Good Times with a bomb threat.

The inculpatory nature of the Pamperin Statement is not its only particularized guarantee of trustworthiness. The Pamperin Statement was given without any offer of leniency by police. This makes sense, as David was neither detained by police nor threatened with any prosecution in 1987. In short, David was facing none of the pressures that might give an incentive to shift blame to another person. This differs in all material respects with the situation in *Lilly*, in which a suspect was taken into custody, asked leading questions in a police interrogation, and threatened with prosecution. *See id.* at 121-22. The Pamperin Statement also had a relatively high degree of detail regarding what the brothers and their friend did on the night of August 2, 1987. Given these factors, we cannot say that the Wisconsin Court of Appeals acted unreasonably in determining that the Pamperin Statement bore particularized guarantees of trustworthiness.

Robert also claims that the introduction of Swendby's statements from David's trial regarding David's admissions to him constituted a Confrontation Clause violation. While there are two levels of hearsay in this evidence, Robert only challenges the statements of David to Swendby as violative

of his Confrontation Clause rights. Robert contends that, since prison officials were involved in procuring the statements, the Wisconsin Court of Appeals incorrectly concluded that the statements bore particularized guarantees of trustworthiness.

However, David's statements to Swendby occurred after Swendby asked David about his sleeptalking. At this time, there was no involvement by either police or prison authorities. David then confided in Swendby, admitting that he committed the murder with his brother and offering some details. This court has held that jailhouse confessions to cellmates "are also trustworthy and admissible," satisfying the requirement of particularized guarantees of trustworthiness. *United States v. Westmoreland*, 240 F.3d 618, 627-28 (7th Cir. 2001). Only after David confessed to him did Swendby inform authorities who asked him to gather more information. This after-the-fact involvement by the authorities does not make David's statements to Swendby untrustworthy. The Wisconsin Court of Appeals acted reasonably in concluding that these statements had particularized guarantees of trustworthiness.

## C

Additionally, even if we were to find that the trial court committed some constitutional violation in admitting the Pamperin Statement or Swendby's testimony, we would deem such a violation a harmless error in this case. Under this analysis, a new trial is warranted if the error has a substantial and injurious effect or influence on determining the jury verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). "Even where the jury has been exposed to evidence that is not properly before it, a defendant is not automatically entitled to a new trial." *United States v. Gonzalez*, 319

F.3d 291, 297 (7th Cir. 2003). A new trial is in order only if the evidence had a prejudicial effect. *See id.* In this case, the challenged evidence did not have a substantial effect in determining the jury's verdict because of the other evidence presented at trial, which supported that finding. The Pamperin Statement simply established that Robert purchased beer from Lison's bar on the day she was murdered. While the statements from David to Swendby are more substantive, they are cumulative. David independently confirmed to the police in 1998 what he had told Swendby about the murder. Inmates at Oshkosh also reported that David told them about the murder, implicating both brothers. Finally, Andrews testified that Robert talked about the murder with her. Given the amount of evidence establishing that David and Robert committed the murder, any error regarding the admission of the Swendby statements cannot be held to be prejudicial.

## III

Robert Bintz has failed to show that the Wisconsin courts acted unreasonably when denying his Confrontation Clause claims. Those claims that were not procedurally defaulted were properly analyzed under the relevant Supreme Court precedent. We AFFIRM the denial of the petition for writ of habeas corpus.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*