In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1666

IRVING L. CROSS,

*Petitioner-Appellant,*

*v.*

MARCUS HARDY, Acting Warden,*

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:05-cv-05692—**William J. Hibbler,** *Judge.*

ARGUED NOVEMBER 30, 2009—DECIDED JANUARY 13, 2011

Before KANNE, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Irving Cross was arrested and charged with several counts of kidnapping and sexual assault in connection with the alleged rape of a woman Cross claimed was working as a prostitute. According to

---

* We substitute Marcus Hardy, the current warden of Stateville Correctional Center, as the Respondent in this action. *See* Fed. R. App. P. 43(c)(2).

Cross, the complainant consented to the sexual contact in exchange for money and drugs. During Cross's first trial, the jury returned a verdict of not guilty on the kidnapping count but was unable to reach a verdict as to the sexual assault counts. At Cross's retrial on the sexual assault charges, the jury found him guilty of sexual assault, but not guilty of aggravated sexual assault. Cross raised several challenges to the trial court's evidentiary rulings, including its finding that the complainant was unavailable, which permitted the admission of her testimony from the first trial during the second trial. The Illinois appellate court rejected Cross's arguments and affirmed the conviction. Cross later filed a federal habeas petition pursuant to 28 U.S.C. § 2254, which the district court denied. Cross now petitions this court for review, arguing that the state courts improperly concluded that the complainant was unavailable. We find that the state failed to demonstrate that it employed good faith efforts to locate the complainant and that the state appellate court unreasonably applied federal law when it concluded that the complainant was unavailable. Therefore we grant the petition and remand for further proceedings consistent with this opinion.

## I. BACKGROUND[1]

On August 6, 1998, Irving Cross was arrested for sexually assaulting a 19-year-old woman (only identified by her initials, "A.S.") at knifepoint thirty minutes before the arrest. Cross maintained that the sexual contact was consensual and that he had given the complainant money and drugs in exchange for sex. Cross was charged with several counts of criminal sexual assault, aggravated sexual assault, and aggravated kidnapping. He was tried before a jury in November 1999. Before trial, Cross filed an answer to pretrial discovery in which he asserted a consent defense and sought to introduce evidence that A.S. told the doctor who examined her after the incident that "she had been a hooker up until last week" and that she "has used rock cocaine." Cross also sought to introduce his statement to police from the night of the incident, in which he described meeting A.S. at a bus stop in Chicago, giving her money to purchase crack cocaine, smoking the

---

[1] While this appeal was pending, Cross filed a motion to supplement the record with additional items that were not included in the record at the district court. We generally do not supplement the record on appeal, *Ruvalcaba v. Chandler*, 416 F.3d 555, 563 n.2 (7th Cir. 2005), but "have allowed a habeas petitioner to supplement the record on rare occasions . . . when the information included was important to an understanding of the prior proceedings in a plaintiff's case," *George v. Smith*, 586 F.3d 479, 486 n.1 (7th Cir. 2009). Here, we need not rule on the motion because we have reached a decision without reference to the additional citations.

drugs with her in the backyard of an abandoned house, and then having consensual sex with her. The state filed motions *in limine* to preclude Cross from asking about A.S.'s background as a prostitute, her drug use, and Cross's statements to police. The trial court granted the state's motions, finding that any statements about A.S.'s history as a prostitute were barred by Illinois's rape shield statute, 725 ILCS § 5/115-7, and that the alleged prior prostitution was not relevant to whether she consented to sexual contact with Cross on the night in question. The trial court also granted the state's motion with respect to Cross's statements to police and the evidence of A.S.'s drug use, which the court found would only be relevant if it showed that A.S. used drugs on the day of the incident or the day before, as that could affect her ability to observe and recall the incident.

At trial, A.S. was the state's primary witness, but her demeanor and manner of testifying appeared to raise some concerns about her credibility. She was both evasive and hesitant in answering questions, and, according to the trial court, her testimony was filled with long pauses, as demonstrated by the trial court's observation that A.S. took an average of two minutes to answer each question. The jury returned a verdict of not guilty on the aggravated kidnapping counts. On the sexual assault charges, the jury was hung, and the court declared a mistrial.

In early 2000, the state reinitiated its efforts to prosecute Cross, and the second trial was scheduled for March 29, 2000. During a March 20th status call

with the trial judge, the prosecutor indicated that it had not been able to locate A.S. On March 28—a week later and the day before the second trial was to begin—the state filed a motion to declare A.S. unavailable and to use her earlier testimony at Cross's second trial. The state described its investigation into A.S.'s whereabouts as follows: On March 3, an investigator interviewed A.S.'s mother and brother, neither of whom knew where A.S. was. A.S.'s mother also conveyed to the investigator that A.S. was "very fearful and very concerned" about testifying again. The investigator interviewed A.S.'s father on March 9 or 10, and he said he knew nothing about A.S.'s whereabouts. The investigator also checked the county hospital, jail, and morgue.

The state also reported in its motion that it learned from A.S.'s mother on March 10 that A.S. had left home the day before and had not returned. At this point, the state's attorney's office enlisted the help of a detective and a victim's advocate to help locate A.S. The detective duplicated many of the previously unsuccessful search efforts, including visiting the residences of A.S.'s mother and father. On one visit, the mother informed the detective that A.S. could be staying with an ex-boyfriend in Waukegan, Illinois, a city located forty miles north of Chicago. When the detective went to the Waukegan address, the ex-boyfriend's mother informed him that she had not seen A.S. in several months and that A.S. was not staying with her or her son. During another visit to A.S.'s mother's home, A.S's mother advised the detective that A.S. had called her two weeks earlier and told her that she did not want to

testify and would not return to Chicago. The victim's advocate also called A.S.'s mother, who told the advocate that A.S. might be with an ex-boyfriend in Waukegan and that A.S. was enrolled in cosmetology school in another city. Cross then objected to the state's motion to declare A.S unavailable, arguing that the state had not acted in good faith and had not made all feasible efforts to locate A.S. such as looking into certain prominent places that A.S. allegedly frequented. Cross also argued that A.S.'s absence was temporary and did not amount to unavailability. Finding that the state had acted in good faith and expended reasonable efforts to locate A.S., the trial court granted the state's motion to substitute A.S.'s testimony from the first trial at Cross's retrial.

At Cross's second trial, a law clerk from the state's attorney's office read A.S.'s testimony into the record. The law clerk's rendition did not reflect A.S.'s hesitance or lengthy pauses from the first trial, and at times, the law clerk spoke with an inflected tone of voice. When Cross objected to the law clerk's "acting," the trial court instructed the state to "tell her to answer the questions [because] there's a slight inflection on some of her answers." At the conclusion of the trial, the jury returned a verdict of guilty of two counts of sexual assault, and not guilty of aggravated sexual assault. The trial court sentenced Cross to 30 years' imprisonment for each count to be served consecutively.

On direct appeal to the Illinois appellate court, Cross challenged several aspects of his conviction, including

the trial court's suppression of evidence relating to A.S.'s alleged prostitution and drug use and the state's use of the transcript of her former testimony, which Cross argued was a violation of his Sixth Amendment right to confrontation. Although the appellate court "acknowledge[d] concerns" about the absence of live testimony— particularly where the absent witness is the sole eyewitness whose credibility may be crucial—the appellate court affirmed the trial court's finding that A.S. was unavailable based on her apparent desire to avoid being located. The appellate court also agreed with the trial court's determination that the state had met its burden of demonstrating that it engaged in a good faith diligent search to locate A.S., ultimately affirming Cross's conviction and sentence.

The Illinois Supreme Court denied Cross leave to appeal, and Cross filed a petition for a writ of certiorari in the Supreme Court of the United States. After briefing by both parties, the Supreme Court denied the writ. Cross then filed a 28 U.S.C. § 2254 petition with the district court in which he raised Sixth Amendment and due process challenges to several of the trial court's evidentiary rulings, including its finding that A.S. was unavailable. The district court rejected these arguments and denied the petition, finding in part that Cross had failed to demonstrate that the state courts' findings concerning A.S.'s unavailability were an unreasonable application of federal law. Cross now appeals from the district court's denial of his habeas petition and raises only one issue for our review—whether the state appellate court reasonably applied federal law in its

determination that A.S. was unavailable and that the state made a good faith effort to find her.

## II. ANALYSIS

In an appeal from a ruling on a petition for habeas relief, we review the district court's findings of fact for clear error and its rulings on issues of law de novo. *Bintz v. Bertrand,* 403 F.3d 859, 865 (7th Cir. 2005). To qualify for habeas relief under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Cross must show that the state court proceedings adjudicating his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Nonetheless, the Supreme Court has held that certain hearsay statements, including former testimony of an unavailable declarant, may be admissible without running afoul of the Sixth Amendment. *See Ohio v. Roberts,* 448 U.S. 56, 66 (1980) ("[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.'"); *Barber v. Page,* 390 U.S. 719, 724-25 (1968) (holding that a witness is not unavailable unless the government can demonstrate a

good faith effort to obtain the witness's presence at trial).[2] We find that the Illinois appellate court accurately laid out the applicable law governing unavailability even though it did so largely in terms of state rather than federal law. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding these pitfalls [of contradicting federal law] does not require citation of our cases—indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.") (emphasis in original). Thus, although the state appellate court did not cite to any Supreme Court case, the standard it applied regarding the good faith effort requirement was identical to that of *Roberts.*

The central question on appeal is whether the state appellate court unreasonably applied Supreme Court precedent when it affirmed the trial court's unavail-

---

[2] The Supreme Court modified *Roberts's* reliability requirement in *Crawford v. Washington,* 541 U.S. 36, 68 (2004), where the Court held that the Sixth Amendment demands unavailability and a prior opportunity for cross-examination. Despite the current precedent, we must analyze Cross's claims under *Roberts* and its progeny because that was the precedent at the time of the relevant state court decision. *See Teague v. Lane,* 489 U.S. 288, 301 (1989) (prohibiting analysis of reasonableness of state court determination under a "new" Supreme Court rule propounded after state court made its decision); *Bintz,* 403 F.3d at 865-67 (explaining that *Crawford* constitutes "new" Supreme Court precedent under *Teague* and should not be applied retroactively).

ability determination. In order to satisfy the Sixth Amend-
ment, the state must have acted in good faith to obtain
the declarant's presence, and good faith requires under-
taking diligent and reasonable measures. *Roberts,* 448
U.S. at 74-75. The requirement is "not that the govern-
ment must do everything it can to get a witness to
testify, only that it make a reasonable, good faith effort
to get the witness into court." *United States v. Reed,* 227
F.3d 763, 767 (7th Cir. 2000). Ultimately, the "question is
whether the witness is unavailable despite good-faith
efforts undertaken prior to trial to locate and present that
witness." *Roberts,* 448 U.S. at 74. On the other hand, a
"witness is not 'unavailable' . . . unless the prosecutorial
authorities have made a good-faith effort to obtain his
presence at trial." *Barber,* 390 U.S. at 724-25.

The state appellate court found that the state's investiga-
tion demonstrated that the state "undertook an exten-
sive search for A.S., including traveling to Waukegan.
It engaged two of its own employees as well as a detec-
tive to locate A.S." We are unconvinced by this rea-
soning, as a forty-mile drive and the recruitment of
two employees does not render the search "extensive,"
particularly where neither the Waukegan trip nor the
extra help appeared to add much value. The extent of
the detective and advocate's assistance was to repeat
the same investigative strategies that had proven unsuc-
cessful for the state's investigator, including going to the
residences of A.S.'s parents and inquiring about A.S.'s
presence with the county jail, hospital, and morgue.
Indeed, the bulk of the state's investigation into A.S.'s
whereabouts consisted of talking to her family mem-

bers, which is insufficient to satisfy the Confrontation Clause here. *See United States v. Hite,* 364 F.3d 874, 882-83 (7th Cir. 2004) (affirming district court's conclusion that defendant had not made reasonable efforts to locate witness when sole attempt to contact witness was talking to his family members despite other available means to locate witness). And the fact that the investigator and detective contacted state departments where there was little likelihood of finding A.S. (e.g., contacting the morgue despite being told by A.S.'s mother that she had spoken to her recently and simply did not know her exact whereabouts) does not establish the state's good faith. *See Roberts,* 448 U.S. at 74 ("The law does not require the doing of a futile act.").

The only new information secured by the detective and advocate concerned the ex-boyfriend in Waukegan and A.S.'s enrollment in beauty school, neither of which were noteworthy or particularly helpful to the investigation. While the detective drove to the ex-boyfriend's house in Waukegan, it does not appear that any effort was made to contact A.S.'s current boyfriend—whom she was with just moments before the alleged assault—or any of her other friends in the Chicago area. And with respect to the beauty school, there is no indication that the advocate or the detective (to whom the advocate passed along the information) asked for the name or location of the school, much less made any attempt to contact the school to inquire about whether anyone had seen A.S. In our view, the state's failure to investigate these leads does not comport with a showing of reasonable good faith.

Given the importance of A.S.'s testimony, the state was obligated to exert great effort to locate her. "The more important the witness to the government's case, the more important the defendant's right, derived from the Confrontation Clause of the Sixth Amendment, to cross-examine the witness." *United States v. Foster*, 986 F.2d 541, 543 (D.C. Cir. 1993). And as the Tenth Circuit has explained, "the more crucial the witness, the greater the effort required to secure his attendance." *Cook v. McKune*, 323 F.3d 825, 835-36 (10th Cir. 2003); *see also United States v. Mann*, 590 F.2d 361, 367 n.6 (1st Cir. 1978) ("A lesser effort might be reasonable where the testimony goes to minor, collateral, or uncontested matters."). A.S.'s testimony here was crucially important to the state's prosecution, as she was the complainant and sole witness. And the importance of her live testimony is underscored by the apparent credibility issues from Cross's first trial. As the Supreme Court has recognized, the jury's ability to evaluate a witness's demeanor via live testimony is the foremost concern of the Confrontation Clause. *See Barber*, 390 U.S. at 721 ("[T]he primary object of [the Confrontation Clause is to afford the accused] . . . an opportunity not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."). Here, A.S.'s testimony at the first trial was pause-filled and evasive, which may have adversely affected the jury's impression of her, as is perhaps demonstrated by the

verdict of not guilty on the kidnapping count and the lack of a verdict on the sexual assault counts. The questions surrounding A.S.'s demeanor and credibility thus became the gravamen of the second trial. And without her live testimony, the second jury was forced to make a credibility determination based on the cold transcript, which it could not objectively do, particularly given the law clerk's more fluid and inflected reading of the transcript.

In light of A.S.'s importance as a witness, the state should have taken other proactive measures to secure her presence at the second trial, particularly given that the state had ample notice of A.S.'s tremendous reluctance to testify again. A.S. had expressed her fears about testifying as early as the conclusion of the first trial, at which point she indicated that she was scared to testify again, but eventually agreed to do so. As of March 3 (26 days before Cross's second trial was to begin), the state knew that there was little chance of A.S. testifying: The state's investigator who had gone to A.S.'s residence could not locate her and was told by A.S.'s mother that A.S. was "very fearful and very concerned" about testifying again. Even after receiving this information, the state took no additional steps to locate A.S. until March 10, when A.S.'s mother informed the state's attorney's office that she had apparently run away the day before.

"If there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation." *Burns v.*

*Clusen,* 798 F.2d 931, 937 (7th Cir. 1986). One such measure available to the state was to subpoena A.S. immediately after it learned of her reluctance to testify. We do not believe that the state is required to subpoena every reluctant witness in order to adhere to the Sixth Amendment, but, here, where A.S. was a critical witness and the state had ample notice of her reluctance to testify and her proclivity to disappear without informing anyone of her whereabouts, the state should have issued a subpoena to secure A.S.'s presence at the second trial. Supreme Court precedent supports the use of such a court process to obtain the presence of certain material witnesses. *See Roberts,* 448 U.S. 56 (finding unavailability after witness disregarded five subpoenas to appear in court); *Barber,* 390 U.S. 719 (finding that state's failure to attempt to utilize court process to secure presence of witness incarcerated in federal prison violated habeas petitioner's Sixth Amendment rights); *Berger v. California,* 393 U.S. 314 (1969) (finding that state's failure to subpoena witness and defendant's lack of opportunity to cross-examine witness violated defendant's Sixth Amendment rights). We have held that the government's use of subpoenas or material witness arrest warrants is strong evidence of good faith. *See, e.g., United States v. Ochoa,* 229 F.3d 631, 637 (7th Cir. 2000) (finding that government's search for witness—including securing material witness arrest warrant and interviews with his employer, landlord, and other individuals—constituted a reasonable, good faith effort).

We do not lightly reach our conclusion that the state court unreasonably applied federal law, but under the

circumstances of this case, where A.S.'s testimony was critical and the state neglected to subpoena her despite knowing that she was extremely reluctant to testify, we find that the state did not sufficiently demonstrate that it acted in good faith. Similarly, the state's duplicative efforts and its failure to more thoroughly investigate were also insufficient to protect Cross's Sixth Amendment rights. As such, the state trial court and appellate court unreasonably applied federal law in determining that A.S. was unavailable.

## III.  CONCLUSION

We REVERSE the judgment of the district court. The writ of habeas corpus is GRANTED unless the State of Illinois elects to retry Cross within 120 days of issuance of this court's final mandate, or of the Supreme Court's final mandate.