# SUPREME COURT OF THE UNITED STATES

### MARCUS HARDY, WARDEN *v.* IRVING L. CROSS

#### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 11–74.   Decided December 12, 2011

PER CURIAM.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U. S. C. §2254, "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Felkner* v. *Jackson*, 562 U. S. \_\_\_, \_\_\_ (2011) *(per curiam)* (slip op., at 4) (internal quotation marks omitted).   In this case, the Court of Appeals departed from this standard, and we therefore grant certiorari and reverse.

Irving Cross was tried for kidnaping and sexually assaulting A. S. at knifepoint. Cross claimed that A. S. had consented to sex in exchange for money and drugs.   Despite her avowed fear of taking the stand, A. S. testified as the State's primary witness at Cross' trial in November 1999 and was cross-examined by Cross' attorney.   According to the trial judge, A. S.'s testimony was halting.   The jury found Cross not guilty of kidnaping but was unable to reach a verdict on the sexual assault charges, and the trial judge declared a mistrial.   The State decided to retry Cross on those counts, and the retrial was scheduled for March 29, 2000.

On March 20, 2000, the prosecutor informed the trial judge that A. S. could not be located.   A week later, on March 28, the State moved to have A. S. declared unavailable and to introduce her prior testimony at the second trial.

The State represented that A. S. had said after the first trial that she was willing to testify at the retrial.   The

State said that it had remained in "constant contact" with A. S. and her mother and that "[e]very indication" had been that A. S., "though extremely frightened, would be willing to again come to court and testify." Record, Exh. J, p. 111 (hereinafter Exh. J). On March 3, however, A. S.'s mother and brother told the State's investigator that they did not know where she was, and A. S.'s mother reported that A. S. was "very fearful and very concerned" about testifying again. Record, Exh. K, p. E–9 (hereinafter Exh. K); *id.*, at E–14. On March 9 or 10, the investigator interviewed A. S.'s father, who also had "no idea where [A. S.] was." *Id.*, at E–12. The father's only suggestion was to refer the investigator back to the mother.

On March 10, the State learned from A. S.'s mother that A. S. had run away from home the day before and had not returned.* Exh. J, at 111. Thereafter, "efforts began by members of the Cook County State's Attorney's Office and by law enforcement personnel to locate" A. S. *Id.*, at 112. The State averred that its efforts included the following:

> "Constant personal visits to the home of [A. S.] and her mother, at all hours of the day and night. This is where the victim has lived since the sexual assault occurred.

> "Personal visits to the home of [A. S.'s] father. This is where the victim lived when the sexual assault occurred.

> "Personal conversations, in English and in Spanish, with the victim's mother, father, and other family members.

---

*The State's motion does not mention the investigator's March 3 visit with A. S.'s mother and brother, and the record in this case does not make entirely clear when A. S. disappeared and when the State's attorney actually became aware of this fact. In any event, the parties do not dispute the facts in this case regarding the State's efforts to locate A. S. See App. to Pet. for Cert. 17a.

Per Curiam

"Telephone calls, in English and in Spanish, to the victim's mother, father, and other family members.

"Checks at the Office of the Medical Examiner of Cook County.

"Checks at local hospitals.

"Checks at the Cook County Department of Corrections.

"Check at the victim's school.

"Check with the family of an old boyfriend of the victim.

"Check with the Illinois Secretary of State's Office.

"[Department of] Public [A]id check." *Id.*, at 112–113.

The State also inquired at the Department of Public Health, the morgue, the Cook County Jail, the Illinois Department of Corrections, the Immigration Department, and the post office. See Exh. K, at E–14 to E–17, E–21; App. to Pet. for Cert. 18a. The State's investigator was assisted in the search by a police detective and a victim's advocate. The detective visited A. S.'s father's home once and went to A. S.'s mother's home—A. S.'s last-known residence—on numerous occasions, approximately once every three days, at different hours of the day and night. Exh. K, at E–27 to E–29, E–35. On one visit, A. S.'s mother told the victim's advocate that A. S. could be staying with an ex-boyfriend in Waukegan, Illinois, 40 miles away. *Id.,* at E–42 to E–43. The police detective visited the Waukegan address but was informed by the ex-boyfriend's mother that she had not seen A. S. in several months and that A. S. was not staying with her or her son. *Id.,* at E–33 to E–34. The efforts to find A. S. continued until March 28, the day of the hearing on the State's motion. *Id.,* at E–30.

On a final visit to A. S.'s mother on the morning of March 28, the mother informed the police detective that A. S. had called approximately two weeks earlier and had said that she did not want to testify and would not return to Chicago. See *id.*, at E–30; 632 F. 3d 356, 359 (CA7 2011). A. S.'s mother told the detective that she still did not know where A. S. was or how to contact her. Exh. K, at E–30.

The trial court granted the State's motion and admitted A. S.'s earlier testimony. The trial court concluded that the State had "expended efforts that go way beyond due diligence," *id.*, at E–65, and that A. S. "ha[d] made it impossible for anybody to find where she is . . . in spite of what I think are superhuman efforts to locate [her]," *id.*, at E–67. At Cross' retrial, a legal intern from the State's attorney's office read A. S.'s prior, cross-examined testimony to the jury. According to the opinion below, the clerk's reading of the prior testimony did not include the long pauses that occurred at the first trial, and the clerk read the transcript with a slight inflection. See 632 F. 3d, at 359. The jury acquitted Cross of aggravated sexual assault but found him guilty of two counts of criminal sexual assault.

On appeal, the Illinois Court of Appeals agreed that A. S. was unavailable because "[i]t is clear from her telephone conversation with her mother that she was not in the city" and "also evident that she was in hiding and did not want to be located." *Id.*, at 83a. The court found that the State had conducted a good-faith, diligent search to locate A. S., and that the trial court had properly allowed the introduction of A. S.'s cross-examined testimony from the first trial. The court, therefore, affirmed Cross' convictions and sentence. The Supreme Court of Illinois denied Cross' petition for leave to appeal, and we denied Cross' petition for a writ of certiorari.

Cross then filed a petition for a writ of habeas corpus

under 28 U. S. C. §2254 in the United States District Court for the Northern District of Illinois. Cross argued, among other things, that the state court had unreasonably applied clearly established Supreme Court precedents holding that the Confrontation Clause of the Sixth Amendment precludes the admission of the prior testimony of an allegedly unavailable witness unless the prosecution made a good-faith effort to obtain the declarant's presence at trial. The District Court denied Cross' petition, but the Seventh Circuit reversed. According to the Seventh Circuit, the Illinois Court of Appeals was unreasonable in holding that the State had made a sufficient effort to secure A. S.'s presence at the retrial. The Seventh Circuit stressed the importance of A. S.'s testimony and the manner of her testimony at the first trial.

In *Barber* v. *Page*, 390 U. S. 719 (1968), we held that "a witness is not 'unavailable' for purposes of the . . . confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Id.*, at 724–725. In *Barber*, we held that a witness had not been unavailable for Confrontation Clause purposes because the State, which could have brought the witness to court by seeking a writ of habeas corpus ad testificandum, had "made absolutely no effort to obtain [his] presence . . . at trial" apart from determining that he was serving a sentence in a federal prison. *Id.*, at 723; see also *id.*, at 725.

We again addressed the question of witness unavailability in *Ohio* v. *Roberts*, 448 U. S. 56 (1980). In that case, we held, the State had discharged its "duty of good-faith effort." *Id.*, at 75. We noted that the prosecutor had spoken to the witness' mother, who reported that she had no knowledge of her daughter's whereabouts and "knew of no way to reach [her] even in an emergency." *Ibid.* We also noted that the State had served five subpoenas in the witness' name to her parents' residence over a 4-month

period prior to the trial. "'The lengths to which the prose-cution must go to produce a witness,'" the Court made clear, "'is a question of reasonableness.'" *Id.*, at 74 (quot-ing *California* v. *Green*, 399 U. S. 149, 189, n. 22 (1970) (Harlan, J., concurring)). We acknowledged that there were some additional steps that the prosecutor might have taken in an effort to find the witness, but we observed that "[o]ne, in hindsight, may always think of other things." 448 U. S., at 75. But "the great improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution." *Id.,* at 76.

In the present case, the holding of the Illinois Court of Appeals that the State conducted the requisite good-faith search for A. S. did not represent an unreasonable appli-cation of our Confrontation Clause precedents. Whether or not the state court went too far in characterizing the prosecution's efforts as "superhuman," the state court identified the correct Sixth Amendment standard and applied it in a reasonable manner.

The Seventh Circuit found that the State's efforts were inadequate for three main reasons. First, the Seventh Circuit faulted the State for failing to contact "A. S.'s current boyfriend—whom she was with just moments before the alleged assault—or any of her other friends in the Chicago area." 632 F. 3d, at 362. But the record does not show that any of A. S.'s family members or any other persons interviewed by the State provided any reason to believe that any of these individuals had information about A. S.'s whereabouts.

Second, the Seventh Circuit criticized the State because it did not make inquiries at the cosmetology school where A. S. had once been enrolled, *ibid.*, but the court's own opinion observed that the information about A. S.'s en-rollment at the cosmetology school after the mistrial was

not "noteworthy" or "particularly helpful." *Ibid.* Since
A. S. had not attended the school for some time, Exh. K, at
E–42, there is no reason to believe that anyone at the
school had better information about A. S.'s location than
did the members of her family.

Finally, the Seventh Circuit found that the State's
efforts were insufficient because it had neglected to serve
her with a subpoena after she expressed fear about testify-
ing at the retrial. A. S., however, had expressed fear
about testifying at the first trial but had nevertheless
appeared in court and had taken the stand. The State
represented that A. S., although fearful, had agreed to
testify at the retrial as well. 632 F. 3d, at 362. We have
never held that the prosecution must have issued a sub-
poena if it wishes to prove that a witness who goes into
hiding is unavailable for Confrontation Clause purposes,
and the issuance of a subpoena may do little good if a
sexual assault witness is so fearful of an assailant that she
is willing to risk his acquittal by failing to testify at trial.

As we observed in *Roberts*, when a witness disappears
before trial, it is always possible to think of additional
steps that the prosecution might have taken to secure the
witness' presence, see 448 U. S., at 75, but the Sixth
Amendment does not require the prosecution to exhaust
every avenue of inquiry, no matter how unpromising.
And, more to the point, the deferential standard of review
set out in 28 U. S. C. §2254(d) does not permit a federal
court to overturn a state court's decision on the question of
unavailability merely because the federal court identifies
additional steps that might have been taken. Under
AEDPA, if the state-court decision was reasonable, it
cannot be disturbed.

The petition for a writ of certiorari and Cross' motion to
proceed *in forma pauperis* are granted, and the judgment
of the Court of Appeals for the Seventh Circuit is

*Reversed.*