[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10332
Non-Argument Calendar
_____

D.C. Docket No. 1:11-cv-20907-MGC

LEVI JESSIE MEDINA,
a.k.a. Juan Perez,

                                                    Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,

                                                    Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 7, 2018)

Before WILSON, JORDAN, and HULL, Circuit Judges.

PER CURIAM:

Levi Jessie Medina, a Florida prisoner, appeals pro se the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. After a jury trial, Medina was convicted of: (1) attempted first-degree murder without discharging a firearm; (2) criminal mischief over $1,000.00; (3) tampering with physical evidence; and (4) display, use, threat, or attempted use of a firearm while committing a felony. Based on the prosecution's closing arguments at his trial, Medina moved for a new trial, which the state court denied. In his § 2254 petition, Medina claims the prosecution's comments in closing argument denied his constitutional right to a fair trial under the Due Process Clause.

After careful review, we conclude that the state trial court's denial of Medina's claim that he was denied a fair trial was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. Accordingly, we must affirm the district court's denial of Medina's § 2254 petition.

## I.    BACKGROUND

### A.    Offense Conduct

This case involves the murder of a young man named Victor Espejo. After work on April 10, 2001, Espejo left his grandmother's house with plans to go to a birthday party for a girl who petitioner Levi Medina knew. Driving his 1998 white

2

Pontiac Sunfire, Espejo met up with petitioner Medina and another man, Floyd Ruel, at Medina's house.

Espejo drove for the group. On their way to the party, they picked up a fourth man, Modesto Guzman—who brought along a .22 caliber pistol in a black purse—and the four purchased some alcohol.

The party ended just after midnight, and the group proceeded to Miami Beach. They parked in South Beach, met some girls, and stayed until 2:00 or 3:00 a.m. As they left the beach, Medina complained that there were too many people in Espejo's Pontiac car, pulled out the .22 caliber pistol from underneath his seat, and fired four or five shots out of his window. Ruel asked to be taken home and was dropped off around 3:30 a.m.

The next morning, Espejo's grandmother, Graciela Garcia, noticed that Espejo had not come home and decided to call the police. In an effort to find her grandson, Garcia contacted several of Espejo's friends and acquaintances, including Medina. Medina admitted that he was out with Espejo that night. Medina told Garcia that, at the end of the night, Espejo went to the Homestead neighborhood with "some little black guy" and that "they stayed on 27th Avenue and 14th or something like that."

Also the next morning, Ruel called Medina to talk about the girls they had met at the beach. Ruel later drove to Medina's house and noticed that Medina was

3

acting strangely.  When questioned about his behavior, Medina asked Ruel if he was wearing a wire and then admitted that he had done something bad.

A few days later, Medina confided in Ruel that Espejo was missing and that police found Espejo's car, which had been set on fire.  Medina claimed that he learned this information from the news.  Medina also told Ruel that after dropping him off, Medina, Guzman, and Espejo were at a gas station when "some black guy approached the car and was asking [Espejo] for a ride" in exchange for $40.  Medina claimed that Espejo "sold him out" and decided to give the "black guy" a ride, while Medina and Guzman were left to walk home.  In a conversation about two weeks later, Medina told Ruel that police were looking for Espejo and that, when they contacted him, Ruel should tell the "black guy story" but not mention the firearm they had had in the vehicle that night.

When Medina was interviewed by police, he gave three different stories of what happened on the evening that Espejo disappeared.

In the first story, consistent with what he told Ruel and Garcia, Medina claimed that he and Guzman went into a gas station and that an unknown black male approached Espejo at the pump for a ride.  Medina described this black man to police as 18–19 years old with two or three gold teeth, of average height, a thin build, and braided hair.  In this first story, Medina and Guzman were forced to walk home.

4

In a second story, the three still went to a gas station, but Medina and Guzman showed the .22 caliber pistol to the unknown black male, who then stole the firearm and ran away with it. Medina claimed that, after buying gas, Espejo dropped Medina off at home and left with Guzman. Guzman came over to Medina's house the next morning and was driving Espejo's car. Presumably, Guzman had killed Espejo the night before, and so Medina and Guzman drove to the Everglades to retrieve Espejo's body.

As the police interview continued, Medina told a third story, where he confessed and admitted that the first and second stories involving an unknown black male were lies. In his verbal confession, Medina said that he, Guzman, and Espejo were headed to Miccosukee, Florida and stopped off to urinate. At this time, Medina pointed the .22 caliber pistol gun at Espejo's head and squeezed the trigger twice. The gun jammed, so Guzman took it, cleared the chamber, and Guzman then shot Espejo in the head two times. Medina and Guzman later discarded Espejo's body in a dumpster and lit his car on fire. Espejo's body was never found.

## B.    Indictment

A Florida grand jury charged Medina with (1) first degree murder (Count 1), (2) criminal mischief over $1,000.00 (Count 2), (3) tampering with physical evidence (Count 3), and (4) display, use, threat, or attempted use of a firearm while

5

committing a felony (Count 4).[1]  The case proceeded to trial on November 28,

2007.

## C.    Closing Argument, the Jury's Verdict, and Sentencing

During closing arguments, the prosecution walked through what occurred on

the night of April 10, 2001 and the events that followed, eventually arriving at the

story told initially by Medina.  The prosecutor recounted Medina's initial story

about "this black guy," stating:

> He's got that story that he made up.  That we went to this Amoco
> station and this black guy came out and he needed a ride and
> something about 40 dollars and I got dropped off and I had to walk
> home.  First of all, it's an ugly story because it's sort of a racist --.

Defense counsel objected to this characterization, and the state trial court overruled

the objection.  The prosecution continued that Medina had made up an initial story

that involved racial stereotyping:

> So it's a racist stereotype, maybe that's why he said, you know, some
> young black guy, and eventually gets a full description, body height,
> gold teeth, all sorts of stuff.  But he admits that the same story is a
> complete, complete lie when the cops talk to him.  He tells them I
> made that all up, it never happened, there was no such stuff.  But
> that's the story he sort of weaves through all of his conversations with
> everybody.

In his closing argument, Medina's defense counsel later responded that there

was nothing racial about the fact that his client had initially referred to a black guy:

---

[1]Co-defendant Modesto Guzman was charged in Counts 2 and 3 of this indictment, which also charged Guzman alone in a fifth count.

> But one thing we do know, ladies and gentlemen, that [Espejo] was the driver of the vehicle and [Espejo] dropped [Ruel] at home. But once [Espejo] left the gas station, there was nothing racial about the fact that there was a black guy. There was nothing racial. I'm black. I'm his lawyer, so there's no big deal there ladies and gentlemen, but that black guy left after that. So who did it, that guy who left with [Espejo].

Defense counsel also moved for a new trial based on the prosecution's comments, which the state trial court denied. After deliberations, the jury returned a verdict finding Medina guilty on all four counts, but as to Count 1 only for a lesser-included offense of attempted first degree murder without discharging a firearm. The state trial court imposed concurrent prison sentences of 30 years on Count 1, 5 years on Counts 2 and 3, and 15 years on Count 4.

## D.    Procedural History

Medina appealed his convictions to the District Court of Appeal of Florida, Third District ("Third DCA"), which summarily affirmed on May 13, 2009. See Medina v. State, 8 So. 3d 1275 (Fla. Dist. Ct. App. 2009). Medina did not raise the present issue in his direct criminal appeal.

On May 25, 2010, Medina filed with the Third DCA a petition alleging ineffective assistance of his appellate counsel under Florida Rule of Appellate Procedure 9.141(d), which the Third DCA later denied in an unpublished summary disposition. See Medina v. State, 51 So. 3d 469 (Fla. Dist. Ct. App. 2010).

On January 4, 2011, Medina filed a petition for rehearing, which was denied.

On March 16, 2011, Medina filed the present § 2254 petition.

In his § 2254 petition, Medina argued inter alia that "the State inappropriately referred to [him] as a 'racist' by elaborating to the jury the story that he had originally presented to the authorities regarding the 'black male' involved in the possible offense."[2]  The district court held an evidentiary hearing on Medina's § 2254 petition.  At that hearing, Medina's counsel argued that, although the prosecution's comment did not "outright call [Medina] a racist," it inferred that Medina's story involved stereotyping a black male and that this prejudiced Medina.  The government argued that the comment was appropriate to rebut Medina's defense that an unknown black male killed Espejo and that defense counsel cured any prejudice by arguing that Medina could not be racist because his counsel was also a black male.

After the hearing, the district court issued an order denying Medina's § 2254 petition in its entirety and declining to grant a certificate of appealability ("COA") on any of Medina's claims.  As to the prosecution's comments characterizing Medina's story as racist, the district court found that they "were [not] made with

---

[2]Medina's petition asserted five claims: (1) due process violations for failure to prove that Espejo's disappearance was the result of murder; (2) prosecutorial misconduct for appealing to the sympathy of the jury; (3) Sixth Amendment violations for the introduction of an arrest form containing hearsay statements about Guzman's involvement in the crime; (4) prosecutorial misconduct for shifting the burden during closing argument; and (5) prosecutorial misconduct for allegedly calling Medina a racist during closing argument.

the intent of categorizing [Medina] as a racist" and that "any damage that may have resulted . . . was ameliorated soon thereafter by defense counsel's closing statement, wherein he directly addressed the issue." The district court concluded that the state trial court's decision to deny Medina a new trial was not contrary to, or an unreasonable application of, clearly established law and that it did not involve an unreasonable determination of the facts in light of the evidence.

Medina appealed. This Court issued a COA as to the single issue of whether, during closing arguments, the prosecutor improperly inferred that Medina was a racist and thereby prejudiced Medina's substantial rights.

## II.    DISCUSSION

### A.    § 2254 Review

Under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts may only grant habeas relief on claims previously adjudicated in state court if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the

9

relevant state-court decision." Lockyer v. Andrade, 538 U.S. 63, 71, 123 S. Ct. 1166, 1172 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1499 (2000)); see Parker v. Matthews, 567 U.S. 37, 47–49, 132 S. Ct. 2148, 2155 (2012) (holding that the Sixth Circuit erred by applying its precedent on prosecutorial misconduct instead of the Supreme Court's standard in Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986)).

We review de novo the district court's decisions about whether the state court acted contrary to clearly established law, unreasonably applied federal law, or made an unreasonable determination of fact. Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1107 (11th Cir. 2012). However, AEDPA "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." Id. (quoting Hardy v. Cross, 565 U.S. 65, 66, 132 S. Ct. 490, 491 (2011) (per curiam)).

**B.    Clearly Established Law on Prosecutorial Misconduct**

The "clearly established Federal law" for purposes of prosecutorial misconduct was set forth in Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986). See Parker v. Matthews, 567 U.S. 37, 45–49, 132 S. Ct. 2148, 2155 (2012) (stating that Darden was the "clearly established Federal law" for purposes of prosecutorial misconduct). In Darden, the Supreme Court held that improper comments by a prosecutor require a new trial only if they "so infected the

10

[original] trial with unfairness as to make the resulting conviction a denial of due process." 488 U.S. at 181, 106 S. Ct. at 2471 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868 (1974)); see Parker, 567 U.S. at 48–49, 132 S. Ct. at 2155 (noting that Darden provides a "highly generalized" approach to be applied flexibly on a case-by-case basis). It is not enough that the prosecutor's comments were "improper," "offensive," "undesirable[,] or even universally condemned." Darden, 477 U.S. at 181, 106 S. Ct. at 2471. Rather, the prosecutor's misconduct must render the defendant's conviction "fundamentally unfair." Id. at 183, 106 S. Ct. at 2472.

## C.    Arguments and Analysis

On appeal, as he did before the district court, Medina argues that his constitutional right to a fair trial was violated when, during closing argument, the prosecution twice characterized Medina's story about "some black guy" driving away with Espejo as "racist" or based on a "racist stereotype." Medina argues that these comments were improper to the point of justifying a new trial because they effectively inferred that Medina himself was a racist and race was not an issue.

The problem for Medina is that when quoted in context, the prosecutor was recounting how Medina had first told a complete lie that was an ugly, made-up story about victim Espejo in his car at the gas station leaving with an unknown black man with gold teeth and braided hair and making Medina walk.

Furthermore, the prosecution did not call Medina a racist during closing arguments but fairly characterized Medina's made-up story as based on a "racial stereotype" to imply that this "black guy" was the one who left with Espejo, and thus must be who killed him, not Medina. The prosecution did not err in characterizing Medina's lie about who left with Espejo at the gas station.

Even assuming that the remarks were improper, there is no evidence that they "so infected the trial with unfairness as to make the resulting conviction[s] a denial of due process." Darden, 477 U.S. at 181, 106 S. Ct. at 2471. These two isolated comments made during closing argument were insufficient to render Medina's convictions "fundamentally unfair" or to justify a new trial. Id. at 183, 106 S. Ct. at 2472. Moreover, defense counsel was able to, and did, directly rebut these contentions during his closing argument. In any event, Medina points to no Supreme Court authority indicating that the prosecution's arguments based on Medina's made-up story warrant relief under § 2254.[3]

In light of these considerations, Medina has not shown that the state trial court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United

---

[3]In his brief, Medina also argues that the state trial court should have given a curative jury instruction, but we cannot find in the record where Medina's defense counsel requested one. Rather, Medina's counsel asked for a mistrial. Even so, Medina has not shown the state trial court's denial of his motion for a new trial was an unreasonable application of clearly established federal law, and thus no curative instruction was required.

12

States, or that it was based on an unreasonable determination of the facts in light of the evidence presented to the state court.

## III.    CONCLUSION

For all of these reasons, we affirm the district court's denial of Medina's § 2254 petition.

**AFFIRMED.**