Filed 6/23/22  P. v. Ke CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHANKOSAL KE,<br><br>    Defendant and Appellant. | 2d Crim. No. B310622<br>(Super. Ct. No. GA104465)<br>(Los Angeles County) |

Chankosal Ke appeals from the judgment after the jury found him guilty of four counts of forcible oral copulation with a minor over the age of 14 (Pen. Code, former § 288a [current § 287], subd. (c)(2)(C)), 25 counts of forcible rape of a minor over the age of 14 (Pen. Code, §§ 261, subd. (a)(2), 264, subd. (c)(2)), and three counts of forcible sodomy of a minor over the age of 14 (Pen. Code, § 286, subd. (c)(2)(C)).  The trial court sentenced him to state prison for 284 years.  (Pen. Code, § 667.6, subds. (c) & (d).)

Ke contends the trial court erred when it found the victim was unavailable at trial and admitted her preliminary hearing

testimony. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In October 2018, about a week before her 18th birthday, C.K. reported to police that her father, Ke, sexually abused her.

At the preliminary hearing in November 2018, C.K. testified that Ke forced her to have vaginal, oral, and anal sex with him on numerous occasions, starting when she was 15 years old. Ke's attorney cross-examined her at the preliminary hearing.

On March 18, 2019, the court set a trial date of March 28. The case was continued several times until trial began on November 9, 2020.

On March 19, 2019, district attorney investigator Dewayne Eldridge was assigned to locate C.K. and serve her with a subpoena for trial. Between March 2019 and October 22, 2020, he attempted to find her by "constantly" searching law enforcement and social media databases and by speaking to persons connected to her.

On approximately March 20, 2019, Eldridge went to C.K.'s residence in Rosemead but received no response. He checked the license plate of a car parked in the driveway but it was not linked to the Ke family. He went to a neighbor's house to get information, but nobody was home.

At 6:15 the next morning, Eldridge returned to the residence listed for C.K. He spoke to two children who said they lived there since January. He showed them photographs of Ke and C.K., but the children did not know them. Eldridge left a business card and later spoke to the children's mother, who also did not know C.K. or her family.

Eldridge went to another residence in Rosemead that a

2

database linked to the Ke family, but the resident did not know C.K. or her family. He requested information from Ke's possible employer, with negative results.

In April 2019, Eldridge spoke to C.K.'s cousin in Los Angeles who provided C.K.'s Instagram account but did not have her address. Eldridge unsuccessfully attempted to contact C.K. on Instagram. Eldridge contacted the cousin four more times during the next 13 months but received no additional information.

Also in April 2019, Eldridge went to a Los Angeles address identified as the residence of C.K.'s boyfriend, C.C. Eldridge spoke to C.C.'s grandmother and uncle, who said he had moved to Las Vegas. Eldridge visited C.C.'s mother. She said C.C. and C.K. moved to Las Vegas, but she could not provide their address. She phoned C.C. at Eldridge's request but there was no answer.

Eldridge left text messages for C.C. In April, C.C. phoned back and confirmed that he and C.K. were living in Las Vegas. He did not provide an address. C.K. got on the phone but declined to provide her address. She said she did not want to testify again and did not want Ke to go to jail. Eldridge suggested that C.K. speak to her assigned victim advocate and texted C.C. the advocate's number. Eldridge texted C.C. and asked for C.K.'s mailing address, but he did not respond.

Eldridge unsuccessfully sought information from the U.S. Postal Service, Las Vegas Metropolitan Police Department, Nevada Department of Employment, Nevada Department of Taxation and State Background Division, and California Employment Development Department.

In May 2019, Eldridge unsuccessfully attempted to contact an associate of C.K.'s family in Las Vegas by email and phone.

Clark County district attorney investigator Craig Fabert assisted Eldridge by going to the individual's apartment three times, but there was no answer. At Fabert's request, Las Vegas police went to the residence and learned the apartment had been vacant for two months.

Eldridge spoke to C.C.'s mother again and was told that he and C.K. left Las Vegas and were no longer a couple. She said that C.K. was probably living in Rosemead, or with her mother in San Bernardino.

Eldridge contacted C.K.'s mother on six occasions between approximately April 2019 and August 2020. She said she last saw C.K. in February 2019 at a court hearing in Los Angeles. She said C.K. did not live with her but occasionally stayed with her for one or two nights. She said C.K. did not want her to know where she was living. Eldridge ran the license plates for cars parked in the driveway, but they were not registered to C.K. He checked hospitals within a five-mile radius of the San Bernardino and Rosemead addresses. At Eldridge's request, a San Bernardino sheriff's deputy contacted C.K.'s mother, who provided no additional information.

In November 2019, Eldridge spoke with C.C., who said he did not know where C.K. was living. Eldridge asked C.C. to forward a message for C.K. to call Eldridge. C.C. texted that C.K. was refusing to contact the district attorney's office.

Eldridge was unable to contact C.K.'s sister by telephone or email. He spoke with two of C.K.'s brothers on different dates, who said she was living in Los Angeles with a boyfriend whose name they did not know. One brother said in October 2020 that C.K. was no longer on social media and did not have a phone.

Eldridge surveilled the residence of C.C.'s mother in July,

September, and October 2020, with no results. He talked to her in October 2020 and received no new information about C.K.'s location. Efforts to contact C.C. on October 22, 2020, were unsuccessful.

The trial court found the prosecution exercised reasonable diligence to locate C.K. and she was unavailable as a witness. The court ruled her preliminary hearing testimony was admissible at trial. C.K.'s preliminary hearing testimony was read to the jury.

Other evidence at trial corroborated C.K.'s preliminary hearing testimony. A sexual assault nurse practitioner testified that C.K. reported that Ke forced her to have vaginal, oral, and anal intercourse with him, with the last incident of anal sex two days before she reported the crimes and the last incident of oral and vaginal sex about one week earlier. C.K.'s underwear contained Ke's DNA.

Ke told a detective that C.K. performed oral sex on him more than four times. He said she demanded it and he was afraid she would hurt herself if he refused. But at trial he testified that he never had oral, vaginal, or anal sex with C.K. The jury found Ke guilty of all counts.

## DISCUSSION

Ke contends the prosecution did not make diligent efforts to secure C.K.'s attendance at trial and, as a result, the trial court erred in allowing admission of her preliminary hearing testimony. This contention lacks merit.

"Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the

5

testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a).)

A witness is unavailable if "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) We review the trial court's determination of witness unavailability de novo. (*People v. Wilson* (2021) 11 Cal.5th 259, 291.)

"The prosecution must demonstrate that 'the witness is unavailable and, additionally, that it made a "good-faith effort" [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial.' [Citation.] . . . We evaluate whether the prosecution timely searched for the unavailable witness, whether the prosecution 'competently explored' leads on the witness's location, and the overall import of the unavailable witness's testimony." (*People v. Wilson*, *supra*, 11 Cal.5th at p. 291.)

The prosecution's efforts to locate C.K. clearly establish due diligence. Investigator Eldridge repeatedly searched databases, talked to C.K.'s relatives, boyfriend, and others who might know her whereabouts, sought information from state agencies in Nevada and California, conducted surveillance, and received assistance from other law enforcement agencies. "'[T]he prosecution's efforts [were] timely, reasonably extensive and carried out over a reasonable period.'" (*People v. Wilson*, *supra*, 11 Cal.5th at p. 293.)

Ke contends the prosecution failed to take reasonable measures to keep C.K. from becoming absent. This case is unlike *People v. Louis* (1986) 42 Cal.3d 969, upon which he relies.

6

There, despite the fact the witness was "known to be highly unreliable and likely to disappear," the prosecution arranged for him to be released from custody on his own recognizance, purportedly to visit "an unnamed friend at an undisclosed address." (*Id.* at pp. 974, 978.) Unlike *Louis*, no evidence here suggests that the prosecution "hoped that [C.K.] would disappear" because she "'would not look as good in person as [she] does in reading out of the transcript.'" (*Id.* at p. 993, fn. 7.)

"'[T]he prosecution is not required "to keep 'periodic tabs' on every material witness in a criminal case . . . .'"'" (*People v. Friend* (2009) 47 Cal.4th 1, 68.) C.K. was cooperative during the investigation and at the preliminary hearing, and the prosecution had no "reason to know of a substantial risk that [she] would flee or otherwise disappear." (*Ibid.*) Her history of mental health issues did not suggest that she would disappear. Only after Eldridge began searching did it become evident that she did not want to be found. And her letter asking the court to dismiss the case was sent four months *after* Eldridge began searching for her.

Nor was the prosecution required to take additional measures to locate and serve C.K. The record does not show that a search of the superior court case registry would have produced any useful information regarding C.K.'s location. Leaving a subpoena for C.K. with her mother, as Ke suggests, would not have constituted valid service. (Pen. Code, §§ 1328, subd. (a), 1328d.) It was not possible to use the interstate witness procedure (Pen. Code, § 1334 et seq.) because unlike *People v. Cogswell* (2010) 48 Cal.4th 467, 472, the prosecution did not have an address to serve C.K.

Ke relies upon a statement in *Ohio v. Roberts* (1980) 448 U.S. 56, 74, disapproved on other grounds in *Crawford v.*

7

*Washington* (2004) 541 U.S. 36, 60: "if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation." But the required efforts remain "'a question of reasonableness.'" (*Roberts*, at p. 74.) The prosecution's efforts here exceeded those found sufficient in *Roberts*.

"[W]hen a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence . . . but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." (*Hardy v. Cross* (2011) 565 U.S. 65, 71-72.) The prosecution here exercised due diligence when it "'competently explored' numerous leads," despite the failure to pursue other potential "avenues of inquiry." (*People v. Wilson*, *supra*, 11 Cal.5th at p. 292.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P. J.


We concur:



YEGAN, J.



PERREN, J.

8

Jared D. Moses, Judge

Superior Court County of Los Angeles

_____

Spolin Law and Aaron Spolin for Defendant and Appellant.
Rob Bonta, Attorney General, Lance E. Winters, Chief
Assistant Attorney General, Susan Sullivan Pithey, Assistant
Attorney General, Scott A. Taryle and Chung L. Mar, Deputy
Attorneys General, for Plaintiff and Respondent.