

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-20-00234-CR

---

JUSTIN BYRD, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

---

On Appeal from the 361st District Court
Brazos County, Texas,[1]
Trial Court No. 18-04002-CRF-361, Honorable Steve Smith, Presiding

---

July 13, 2022

## MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Appellant, Justin Byrd, appeals following a jury trial and conviction for aggravated assault with a deadly weapon.[2]  He was sentenced to seventy-five years' confinement.[3]

---

[1] Because this appeal was transferred from the Tenth Court of Appeals, we are obligated to apply its precedent when available in the event of a conflict between the precedents of that court and this Court. *See* TEX. R. APP. P. 41.3.

[2] *See* TEX. PENAL CODE ANN. § 22.02(a)(2) (a second-degree felony).

[3] Appellant's sentence was enhanced by a prior felony conviction in 2012.  *See* TEX. PENAL CODE ANN. § 12.42(b) (first-degree felony).

In two issues, Appellant asserts the trial court abused its discretion when it admitted hearsay statements that violated (1) his right to confrontation under the United States Constitution[4] and (2) did not fall within any exception to the hearsay rule. We affirm.

Background

Appellant was indicted for intentionally, knowingly, and recklessly causing bodily injury to Rashaad Smith by shooting him with a firearm. The indictment characterized Appellant as a "habitual offender" subjecting him to a potential enhanced sentence,[5] as Appellant previously had been convicted of aggravated robbery (in 2005) and felony evading arrest/detention with vehicle (in 2012).

Smith's shooting occurred during the early evening of July 31, 2017, outside an apartment complex on Baker Avenue, in Bryan, Texas. As discussed further below, after shots were fired, at least three witnesses reported seeing a black vehicle speed away from the scene in the direction of St. Joseph Health Regional Hospital. Another witness reported having seen an African American male who lives in apartment C-4 running from the area where the shooting occurred while holding what appeared to be a small pistol. The man briefly entered apartment C-4 and then exited, driving away with a woman. The witness recognized a photograph of Appellant as the man who entered apartment C-4 and later drove away.

---

[4] U.S. CONST. amend. VI. ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.").

[5] TEX. PENAL CODE Ann. § 12.42(d) (mandatory sentence of 25-99 years).

During this period, Smith, bleeding from multiple gunshot wounds, arrived at St. Joseph's driving a black BMW. Smith reportedly told Beau Wallace, an off-duty detective working in hospital security, that "Head" made a derogatory comment at Smith and then shot at him six times. Smith said "Head" lives in the apartment complex on Baker Avenue. Smith provided consent for Wallace to recover his mobile phone from the BMW and supplied a passcode to unlock the phone. Thereafter, Wallace found a stored telephone number for "Head" and provided it to the police. The phone number was associated with Appellant. Wallace received a text message from a police officer containing a photo of Appellant. When Wallace showed the image to Smith, the victim replied he was "100% sure" that Appellant is "Head."[6]

Back at the apartment complex on Baker Avenue, spent Winchester .25 cartridge casings were found at the crime scene. Detectives entered apartment C-4 pursuant to a search warrant and found a box containing eight unspent .25 Winchester cartridges. Police collected other evidence, including an envelope addressed to Appellant at apartment C-4.

1. State's allegation that Smith's unavailability for trial was procured by Appellant's wrongful conduct.

As the date for trial neared, the State moved for the trial court to rule that Appellant forfeited his right to object to Smith's out-of-court statements about Appellant's role in the shooting. *See* TEX. CODE CRIM. PROC. ANN. art. 38.49(b), (c).[7] The State alleged Smith's

---

[6] Smith told another detective that Appellant was his "homeboy" and stood over Smith while continuing to shoot at him.

[7] Article 38.49 of the Code of Criminal Procedure provides, in pertinent part, as follows:

sudden reluctance to cooperate and unavailability to testify at trial were due to Appellant's wrongful conduct.

At the July 30, 2020, hearing on the State's motion, Shawn Dunham, a gang investigator with the nearby City of College Station Police Department, testified that Appellant and Smith are documented members of the Bloods criminal street gang. Dunham possesses training and experience about gang membership and testified that Bloods are subject to twenty-one "laws," which is "their constitution, their bylaws, just their code of conduct." In an exhibit admitted without objection and titled "21 Laws," the second law states, in part, "No Snitching." The ninth law states that in place of cousins and kinfolk, Bloods "have people, family, [r]elatives." Law 11 states: "Blood Business is Blood Business."

---

(a) A party to a criminal case who wrongfully procures the unavailability of a witness or prospective witness:

(1) may not benefit from the wrongdoing of depriving the trier of fact of relevant evidence and testimony; and

(2) forfeits the party's right to object to the admissibility of evidence or statements based on the unavailability of the witness as provided by this article through forfeiture of wrongdoing.

(b) Evidence and statements related to a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of a witness or prospective witness are admissible and may be used by the offering party to make a showing of forfeiture by wrongdoing under this article, subject to Subsection (c).

(c) In determining the admissibility of the evidence or statements described by Subsection (b), the court shall determine, out of the presence of the jury, whether forfeiture by wrongdoing occurred by a preponderance of the evidence.

Appellant concedes that article 38.49 substantially corresponds with the requirements for proving forfeiture of the Sixth Amendment right to confront a witness due to the defendant's wrongdoing, as articulated by the United States Supreme Court in *Giles v. California*, 554 U.S. 353, 359 (2008).

The State contends that Smith's cooperation with Appellant's prosecution ceased after a June 2018 jailhouse telephone call from Appellant to Smith. Three months earlier, Smith had continued to identify Appellant as the shooter and had allegedly told officers he would not "drop" charges against Appellant despite a recent request by Appellant that he do so. On June 20, 2018, a caller at the Brazos County Detention Center using the inmate calling system, called Smith's phone. The caller used Appellant's jail-designated personal identification number which identified the caller as "Justin." Below is the court's excerpted transcription[8] of the recorded exchange:

> Smith: Hello? Hello?
>
> Caller: Hey what's up, homie?
>
> Smith: What's up with it?
>
> Caller: Hey, you already know who this is, man. What's up, man. G--- talk to me, man. What's up, fam? Man, I'm trying to get up out this b---, bro. They just brought me down here, man. I'm trying to see what's going on, bro. Man, I just did six and a half months in the county (Inaudible).
>
> Smith: Yeah, I heard.
>
> Caller: Man, what's up, man?
>
> Smith: You (inaudible). You got a bond or what?
>
> Caller: Yeah I got a bond, but it's fifty thousand.[9] Man, I ain't—I ain't—I'm f--- up on my bail right now, bro, I'm—I'm trying to see what's up. I'm—I'm trying to see what's up, bro.
>
> I'm—I need you to do this bro. I ain't tripping. I'll pay you—I'll whatever, man. Whatever you, whatever, you trying to get me

---

[8] The State also prepared its own transcript, which was admitted into evidence in the hearing and at trial. The State's account of the conversation is substantially the same as the court's.

[9] According to the record, Appellant's bond was $50,000 at the time. It was reduced to $5,000 in August 2018.

to do, bro, I'll do it.  I ain't tripping, bro.  I'm just trying to get out, bro.

Smith:    (Inaudible).  * * * *

Caller:   Man, be straight up with me fam.  Just tell me wh—tell me the real.

Smith:    S---, the real is you good.  Like, I ain't fixing to—know what I'm saying?  I ain't fixing, I ain't fixing to do no court s--- on you, none of that s---. (inaudible).  Know what I'm saying. (inaudible) You straight, bro.  Hey bro, you was with me a hundred, bro. I ain't fixing to do no hoe s--- like that. (inaudible).

So I'm telling you: like just bond out.  You ain't—know what I'm saying?  I already tried to go up there do that affidavit s--- and they told me I couldn't do it.

Caller:   They can't tell you they can't (inaudible) –They can't tell you they can't—you can't do no affidavit, bro.  All you gotta do is get it.

Smith:    I went up there—I went up there and said, 'Hey is there somebody to do—like an affidavit saying, "I ain't got nothing to do with this."' (inaudible).

Caller:   The Non-Prosecution Affidavit.  The Non-Prosecution Affidavit—All you gotta do is go take that m--- to the district clerk, bro, and once you get it to them, bro, they gonna go from there.  They can't do nothing.  They can't do nothing.

Smith:    That's what I'm saying. I went to them m---.  And I called my baby momma I was going up there.  Always talking about (inaudible).  I ain't fixing to go to no court.  Not fixing to go to none of that s---.  You ain't gotta worry about no s--- like that.

Caller:   Yeah. * * * *

Smith also refers to his relationship with the caller as "big brother, little brother type s---," and the caller replies, "Right on."

Dunham testified he found a few areas of the telephone call to Smith to be noteworthy.  First, Dunham emphasized the caller offering to pay Smith and do whatever

6

necessary to get out. Second, Dunham found it significant that the caller repeatedly used references to "family" (or the shorthand, "fam"), as well as Smith's characterization of his relationship with the caller as being like a "big brother, little brother." Appellant is older than Smith and became a Blood before Smith did, which, according to Dunham, ranks Appellant higher in the Bloods' relationship hierarchy. Dunham testified the telephone call had the tenor of "more of a mentor, leadership, superior, senior member, authoritative figure talking down to another person . . . ."

Third, Dunham opined that there are consequences of a younger Blood member not following orders of a senior member: "It could range from a variety of things, extreme end murder to the low end assaults, removal from the organization." Accordingly, Dunham agreed with the characterization that a "real threat" is present if a little brother decides to disobey a big brother's orders. Dunham reiterated that before the telephone call to Smith from "Justin," Smith had been cooperative with law enforcement—meeting with investigators multiple times, identifying Appellant as the shooter more than once, and describing what happened to him.

A prosecutor from the Brazos County District Attorney's Office testified that after the June 20 telephone call to Smith, attempts to meet with Smith were unsuccessful. When prosecutors became aware Smith was represented by counsel on a misdemeanor charge, they reached out to Smith's attorney about his participation in the case against Appellant; Smith refused to speak with them. The attorney told prosecutors that Smith "doesn't want to be a snitch and that he seems nervous." When the prosecutor indicated they merely wanted to serve Smith with a trial subpoena, Smith again refused to meet.

7

The State also attempted to contact Smith at his home address, which was also his grandparents' residence. Smith's grandfather said he did not know of Smith's whereabouts and declined to provide a new address and phone. Smith's grandmother instructed prosecutors to leave the property, adding that Smith would contact them if he wanted to. The State's efforts to locate and secure Smith through other family members were equally unsuccessful.

At a forfeiture hearing, the trial court found the State had proven by a preponderance of evidence that Appellant had wrongfully procured Smith's absence for trial. Accordingly, the court granted the State leave to use Smith's out-of-court statements against Appellant at trial.

2. Trial

Four days after the trial court's ruling on the State's forfeiture motion, Appellant's criminal trial commenced. Smith was unavailable for trial. Just as it had the previous week, the trial court ruled it found by a preponderance of the evidence there was forfeiture by wrongdoing and that Smith's out-of-court statements could be considered by the jury. The trial court gave Appellant a running objection to the State's use of Smith's out-of-court statements.

In addition to the evidence discussed above, a number of witnesses testified about Appellant's alleged role in shooting Smith. One resident of the Baker Avenue apartment complex testified that on July 31, 2017, she was in her apartment when she heard the sound of two shots which she initially thought was a nail gun. The witness testified that as she walked outside, she saw Appellant running towards a dark car and using a small

8

gun to fire three more shots at the driver. Appellant then ran back to the apartment, calling for his girlfriend to "come on, let's go."[10] The driver stayed in the vehicle for a few moments and then drove off "pretty quick." Appellant drove off in a white car.

After Smith arrived at St. Joseph's Hospital, Dr. Vincent Ohaju, trauma medical director and chief of surgery treated Smith for gunshot wounds to his neck, chest, head, elbow, and knee area. He testified Smith's right lung was partially collapsed placing him in a life-threatening condition and characterized Smith's condition as "Level 1 trauma activation," the highest level for trauma patients.

Detective Candido Amaya, of the Bryan Police Department, was the on-call detective on July 31, 2017. He arrived at St. Joseph's emergency department and attempted to obtain a statement from Smith while the medical staff provided emergency treatment. According to Amaya, Smith appeared confused and afraid that he would die. Smith asked medical staff if he was okay.

The jury was permitted to watch body cam footage of Detective Amaya's emergency department interview of Smith. Smith told Detective Amaya that someone with the street name "Head" told Smith to "pull up on him." When he arrived outside Head's home on Baker Street, Head shot him. Smith said that after Head shot him, he stood over him and "emptied that clip out." Smith said he pretended to be dead to avoid further harm. When an officer showed Smith a photo of Appellant and asked if that was

---

[10] The witness said she had seen Appellant before at the complex and knew he occupied apartment C-4.

Head, Smith answered in the affirmative. Smith referred to Head as his "homeboy" and said he drove a white car.

Bryan Police Department Detective Shawn Davis also took the stand. Detective Davis testified that several days after the shooting, he visited Smith in the hospital and presented a photo array. Smith again identified Appellant as the person who shot him. Smith said he was "100% confident" that Appellant was the person who shot him.

On August 5, 2020, the jury found Appellant guilty of aggravated assault with a deadly weapon. The next day, Appellant pled "true" to both punishment enhancement paragraphs. The trial court found both enhancement paragraphs to be true and assessed Appellant's punishment at confinement in prison for seventy-five years. On August 18, 2020, Appellant filed his notice of appeal.

Analysis

A defendant in a criminal prosecution has a Sixth Amendment right to be confronted with the witnesses against him. *Crawford v. Washington*, 541 U.S. 36, 68–69, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). However, the United States Supreme Court has recognized two exceptions to this principle. Relevant to this appeal, the "forfeiture by wrongdoing" doctrine provides that a defendant is estopped from asserting his right to confrontation when he has wrongfully procured the unavailability of the witness. *Giles v. California*, 554 U.S. 353, 359, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008). *See also Davis v. Washington*, 547 U.S. 813, 833, 126 S. Ct. 2266, 2280, 165 L. Ed. 2d 224 (2006) (reasoning that "one who obtains the absence of a witness by wrongdoing

forfeits the constitutional right to confrontation"); *Brown v. State*, 618 S.W.3d 352, 355 (Tex. Crim. App. 2021).

In Texas, article 38.49 of the Texas Penal Code codifies the forfeiture by wrongdoing doctrine for offenses committed on or after September 1, 2013. *Colone v. State*, 573 S.W.3d 249, 264 (Tex. Crim. App. 2019); *Schindler v. State*, No. 02-17-00241-CR, 2018 Tex. App. LEXIS 8333, at *6 (Tex. App.—Fort Worth Oct. 11, 2018, no pet.) (mem. op., not designated for publication). The exception applies only "when the defendant engaged in conduct *designed* to prevent the witness from testifying." *Giles*, 554 U.S. at 359 (emphasis in original). In addition, the State must prove that the defendant intended to prevent the witness from testifying. *Schindler*, 2018 Tex. App. LEXIS 8333 at *6 (*citing Giles*, 554 U.S. at 361–62).

Via two issues, Appellant asserts the State failed to demonstrate by a preponderance of the evidence[11] of (1) sufficient efforts by the State to ensure Smith's availability at trial and (2) that Smith's absence was caused by a wrongful act committed by Appellant. He also contends that because Smith's statements were the "linchpin" of the State's case, the evidence would have been legally insufficient to support a guilty verdict in the absence of Smith's out-of-court statements. We disagree with Appellant on all issues for the reasons set forth below.

---

[11] *See* TEX. PENAL CODE ANN. § 38.49(c). In *Schindler*, the Fort Worth Court of Appeals observed that although the Supreme Court has not formally defined preponderance of the evidence as the standard for demonstrating the forfeiture, both federal and state courts tend to follow this practice. 2018 Tex. App. LEXIS 8333, at *8. This standard is also consistent with the manner in which courts resolve other factual questions potentially affecting the admissibility of evidence. *See id.*

Standard of Review

The forfeiture by wrongdoing doctrine pertains to the admission of out of court statements. We therefore review the trial court's decision for abused discretion. *Schindler*, 2018 Tex. App. LEXIS 8333, at *10. *See* also *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002). Under this standard, the trial court's ruling will be upheld as long as it falls within the "zone of reasonable disagreement," and is correct under any theory of law applicable to the case. *Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. (2001). A trial court abuses its discretion only when its decision is "so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (quoting *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992)). When assessing evidence regarding acts alleged to have procured a witness' unavailability, we draw all reasonable inferences in favor of the trial court's finding. *See Brown*, 618 S.W.3d at 357. As the trial court did not issue findings of fact, we review the evidence in the light most favorable to the trial court's ruling and assume the court made findings that are supported by the evidence. *Shepard v. State*, 489 S.W.3d 559, 572–73 (Tex. App.—Texarkana 2016, pet. ref'd) (*citing Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000)).

Whether Smith was "Unavailable" as a Witness

We begin with evidence regarding Smith's alleged unavailability as a witness. *See* art. 38.49(a). The Confrontation Clause and the hearsay rule have similar prerequisites for proving that a witness was unavailable. For purposes of the Confrontation Clause, a witness is "unavailable" if the witness does not appear for trial despite the State's good-

12

faith efforts to obtain his presence.  *See Reed v. State*, 312 S.W.3d 682, 685 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (investigator interviewed family and friends of witness, none of whom knew where she was); *Wise v. State*, No. 11-11-00196-CR, 2013 Tex. App. LEXIS 8446, at *16–18 (Tex. App.—Eastland July 11, 2013, no pet.) (investigators attempted unsuccessfully to serve witness several times at his last known address, contacted his attorney, bail bondsman, and family members).  "The State is not required to engage in clearly futile activities before a trial court can, in its discretion, determine that the State made good-faith efforts to produce a witness at trial."  *Ledbetter v. State*, 49 S.W.3d 588, 594 (Tex. App.—Amarillo 2001, pet. ref'd).

Similarly, to establish "unavailability" under the hearsay rule permitting hearsay testimony when the declarant "is absent from trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony,"[12] the proponent of the testimony must show that a good faith effort was made before trial to locate and present the witness.  *Espinoza v. State*, No. 05-17-00547-CR, 2018 Tex. App. LEXIS 10751, at *34–35 (Tex. App.—Dallas Dec. 21, 2018, no pet.) (mem. op., not designated for publication); *Reed*, 312 S.W.3d at 685.

Here, the State's evidence showed that a few months before trial, prosecutors made numerous attempts to contact and serve Smith with a trial subpoena to no avail. Prosecutors sought to contact Smith through his counsel, who told them Smith did not want to be a "snitch" and appeared nervous about meeting prosecutors.  They also

---

[12] TEX. R. EVID. 804(a)(5).

13

attempted to contact Smith directly by going to his last known address multiple times and speaking with his family. The State even sought to request that the court hearing Smith's misdemeanor case set a hearing to get Smith to appear at the courthouse.

Appellant asserts the State's efforts to contact Smith through his attorney and secure a meeting did not represent a good-faith attempt because there is no requirement that a witness meet with the prosecution before trial, and that the State could have done more to assure Smith's presence. Our role, however, is not to play armchair quarterback. As the Supreme Court has observed, "when a witness disappears before trial, it is always possible to think of additional steps that the prosecutor might have taken to secure the witness' presence, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." *Hardy v. Cross*, 565 U.S. 65, 71–72 (2011) (per curiam). *See Espinoza*, 2018 Tex. App. LEXIS 10751, at *36.

We find there is ample evidence in the record to support the determination that the State made a good-faith effort to secure Smith's presence at trial. We therefore conclude the trial court did not abuse its discretion in ruling Smith was "unavailable." Appellant's first issue is overruled.

Whether Smith's Absence was Wrongfully Procured by Appellant

We next examine whether Smith's absence from trial was due to the wrongful conduct of the Appellant. The State's evidence at the hearing established that Appellant and Smith were members of a criminal street gang—the Bloods. As members, they were subject to "21 Blood Laws," one of which could be translated to mean "[n]o snitching." In

14

addition, testimony showed that Appellant was a senior member to Smith; this meant consequences for Smith's disobeying Appellant's instructions could be deadly.

The evidence, including all reasonable inferences to be drawn therefrom, supports a conclusion that Appellant called Smith from jail, and that Smith's cooperation with the State changed after that call. Initially, including on the day of the shooting, Smith repeatedly identified Appellant as the shooter and described how the shooting occurred. When Smith was called, the person identifying as "Justin" wanted to know "what was going on" and whether the State had contacted Smith. The caller appealed to Smith not to cooperate with prosecutors and to file a non-prosecution affidavit. He, in fact, indicated he would "pay [Smith] whatever," in return for Smith's non-cooperation. During the call, Smith acknowledged that he viewed their relationship as "big brother, little brother." Thereafter, Smith's cooperation ended. His attorney indicated that Smith did not want to be a "snitch" and appeared nervous when discussing the possibility of the State securing his trial testimony.

We conclude the record supports the determination that Appellant wrongfully procured Smith's unavailability as a witness. Although, as Appellant points out, there is no evidence of a direct threat or command from Appellant to Smith, the record certainly evidences an offer of a bribe. Moreover, there exists evidence of a veiled threat in light of Appellant's higher rank than Smith's in the same gang and of the consequences facing those who snitch. *See McGee v. State*, No. 05-17-01445-CR, 2019 Tex. App. LEXIS 3701, at *21 (Tex. App.—Dallas May 7, 2019, no pet.) (mem. op., not designated for publication) ("A direct threat or demand from the defendant to the witness to avoid service or not appear in court is not required."). That Smith did not want to pursue charges when

15

in the emergency room but wanted law enforcement to "take care of it" can be consistent with a desire to avoid violating the Blood laws. This inference is punctuated by the evidence that on July 31, 2017, Appellant shot Smith four times at close range, forcing Smith to feign being killed to escape. Thus, we conclude that the trial court could have reasonably found by a preponderance of evidence that Appellant wrongfully procured the unavailability of Smith as a witness.

Having determined that the doctrine of forfeiture by wrongdoing is applicable and Smith's out-of-court statements admissible, we need not address whether Smith's statements were also admissible under some other exception to the hearsay rule. *Huerta v. State*, No. 03-19-00763-CR, No. 03-19-00764-CR, 2021 Tex. App. LEXIS 2984, at *12–14 (Tex. App.—Austin 2021, pet. ref'd) (mem. op., not designated for publication). Likewise, we need not undertake a harm analysis. Appellant's second issue is overruled.

Conclusion

The trial court's judgment is affirmed.

Lawrence M. Doss
Justice

Do not publish.