J-A08012-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| TYSHEEM SMITH | : | |
| | : | |
| Appellant | : | No. 520 EDA 2023 |

Appeal from the Judgment of Sentence Entered December 9, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001824-2019

BEFORE: BOWES, J., OLSON, J., and McLAUGHLIN, J.

MEMORANDUM BY BOWES, J.:             **FILED JULY 24, 2024**

Tysheem Smith appeals from the mandatory sentence of life imprisonment without the possibility of parole imposed following his convictions for, *inter alia*, first-degree murder. We affirm.

The trial court set forth the following, thorough recounting of the evidence presented at trial establishing that Appellant murdered Marcus Johnson on March 19, 2017:

> Pursuant to an unavailability hearing, the court ruled that Eric DeJesus was unavailable to testify at trial and his testimony from the preliminary hearing was admitted into evidence.
>
> Eric DeJesus testified that on the night of the incident, March 19, 2017, he was initially hanging out with his friend Naire Jones (nicknamed "Daire") at the club, J&S Seafood & Hookah ["(J&S)"], located on the 2400 block of Germantown Avenue. DeJesus and Jones left the club and walked three blocks to the intersection of Sartain Street and Cumberland Avenue where they came across [Appellant] and Edrece Burgess, who were hanging out in Burgess's parked vehicle. Jones was friends with [Appellant] and Burgess, but DeJesus was only familiar with them. DeJesus

recognized [Appellant]'s face but "wasn't around [Appellant], like, really that much."

DeJesus and Jones entered the vehicle with [Appellant] and Burgess. Burgess drove to Germantown Gas Mart, located at 2445 Germantown Avenue, and all four males went into the gas station. Next, the group [returned] to J&S . . . . They arrived around 1:00 a.m. J&S was crowded.

There were a lot of people drinking and dancing and the music was loud. While in J&S, an incident occurred between [Appellant] and Marcus Johnson. DeJesus did not elaborate further on the "incident" in his testimony. However, when previously interviewed by detectives, DeJesus claimed that Johnson stepped on [Appellant]'s sneakers, which resulted in an argument between the two of them.

After the argument, [Appellant], Burgess, Jones, and DeJesus left J&S, and waited outside for Johnson. DeJesus claimed that he wanted to see a fistfight. Burgess eventually walked off, while the other three waited. After a few minutes, at approximately 1:10 a.m., Johnson exited J&S. The [Appellant] started walking towards him, produced a firearm and began shooting at Johnson[.]

Trial Court Opinion, 5/12/23, at 2-3 (cleaned up). Johnson died from four gunshot wounds.

In addition to DeJesus's testimony, the Commonwealth introduced circumstantial evidence linking Appellant to the murder. Detectives obtained surveillance video from the Germantown Gas Mart, with "all four individuals . . . clearly visible on the video." *Id*. at 4. Appellant was "wearing a shiny black hooded puffy jacket, that ha[d] a small logo on the left bicep, black and white sneakers with thick bright red laces, black pants, and a white t-shirt underneath the jacket." *Id*. at 4-5. A crosswalk camera captured a man wearing sneakers with "the same distinct black and white pattern with bright red laces, and his jacket ha[d] the same puffy shape, color, and hood as

- 2 -

depicted in the gas station video." *Id*. at 5. "Moreover, the murder was caught on video, which the jury was able to view, to come to its own conclusion regarding identification." *Id*. at 9. The trial court's opinion characterized the videos as "captur[ing] . . . [Appellant] from when he arrived at the Germantown Gas Market until he fled on foot after the murder. Additionally, . . . [Appellant] can be observed in the Germantown Gas Market store and at the crosswalk, where the murder occurred," due to his distinctive sneakers and clothing. *Id*.

Investigators also obtained locational records showing the phones of Appellant and Burgess connecting to cell phone towers around the area of 4800 Germantown Avenue. The phone records showed Burgess calling Appellant at 12:59 a.m. and 1:00 a.m., with Appellant calling back at 1:01 a.m. After 1:05 a.m., Appellant's phone did not connect to any towers, and a Commonwealth witness opined that Appellant's phone had been turned off.

Following a jury trial, Appellant was convicted of first-degree murder, carrying firearms in the City of Philadelphia, and possessing an instrument of crime. He received the mandatory sentence of life imprisonment without parole and filed timely post-sentencing motions which the trial court denied. Appellant filed a timely notice of appeal and complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement. The trial court prepared a Rule 1925(a) opinion and the matter is ready for review of Appellant's three claims:

1. Whether the trial court erred and violated Appellant's Confrontation Clause rights by concluding that the Commonwealth made a good faith effort to locate and produce a witness prior to allowing that witness'[s] preliminary hearing testimony to be introduced at trial?

2. Whether the trial court erred and violated Appellant's Confrontation Clause rights by concluding that Appellant had been given a full and fair opportunity to cross[-]examine an unavailable witness prior to allowing that witness'[s] preliminary hearing testimony to be introduced at trial?

3. Whether the verdict was against the weight of the evidence on all three of Appellant's convictions given the lack of credibility with the Commonwealth's key witness?

Appellant's brief at 9 (unnecessary capitalization omitted).

Appellant's first two claims both concern the introduction of Eric DeJesus's preliminary hearing testimony. The legal analysis is fact-intensive, and we begin by setting forth a detailed history of DeJesus's failure to appear at trial.

DeJesus testified at the preliminary hearing on March 13, 2019. The parties initially selected a jury on March 1, 2021. DeJesus did not appear, and the trial court held a hearing the next morning on his availability, with the Commonwealth presenting the testimony of Detective Donald Marano. He explained that in mid-February he attempted to serve DeJesus with a subpoena for the upcoming trial. He spoke to DeJesus's probation officer, who supplied an address and phone number. The phone number was not in service. On February 23, he and another officer went to the given address, where they spoke to DeJesus's sister, Ebony Davis, and gave her a subpoena for DeJesus. The following day, officers returned to the home and met with

DeJesus's mother, Charlean McCorkle, who refused to provide her son's phone number. Meanwhile, DeJesus's probation officer said that "[DeJesus] would be issued wanted cards by the 22nd of March" if he failed to contact her. N.T., 3/2/21, at 160. The Commonwealth obtained a material witness warrant for DeJesus on February 25, 2021, as well as a subpoena for McCorkle.[1]

After the Commonwealth obtained the warrant, Detective Marano issued a patrol alert.[2] He returned to McCorkle's home on February 26 and February 28, with negative results. Additionally, two other detectives went to a factory in West Chester, Pennsylvania, approximately thirty-five miles from Philadelphia, based on DeJesus stating in a prior interview that he worked there. The owners stated that their company had never employed DeJesus. The men returned to McCorkle's home and left a subpoena in the door. Detective Marano also asked a police officer "who has a lot of contacts and helped with this investigation . . . to keep an ear out for any information" on DeJesus's whereabouts. *Id*. at 167. Detective Marano related to the trial court the results of his attempt to call the number eventually provided by McCorkle. He identified himself as Detective Marano and the answering male replied, "'[H]ow are you doing' and then hung up." *Id*. at 169. The detective immediately called back but was routed to voicemail. He left a message

---

[1] McCorkle was called to testify on the morning of March 2, 2021. The trial court ordered her to give DeJesus's number to the Commonwealth. Detective Marano attempted to contact DeJesus while the parties selected the jury.

[2] A patrol alert "is, more or less, a wanted poster with a picture and the circumstances of why an individual is wanted." N.T., 3/2/21, at 162-63.

stating that the male could be incarcerated for contempt. The owner did not call back.

Additionally, the trial prosecutor informed the court that after McCorkle refused to provide her son's phone number, he "got a call from Eric DeJesus on an unlisted number. . . . [He] said that he would not be coming to court this week." *Id*. at 3. DeJesus "repeatedly expressed that he would be dead by Monday. He didn't elaborate on what that meant." *Id*. The prosecutor said that DeJesus "switched to talking about our office not doing anything for him with regard to relocation," and informed the court that the Attorney General's Office had "spent over $32,000 on hotel expenses for Eric DeJesus to be relocated. . . . He chose not to relocate." *Id*. at 3-4. The Commonwealth also noted that DeJesus's "probation officer had no contact with him[.]" *Id*. at 4.

The Commonwealth further elicited testimony from Detective Marc Schade, who called eighteen area hospitals, the Philadelphia morgue, and Commonwealth and federal prison facilities to check for DeJesus. He additionally consulted the expense account from the Attorney General's Office, which showed that DeJesus listed McCorkle's address as his residence.

Appellant's trial was postponed shortly after this hearing due to a COVID emergency at the jail. On October 11, 2022, the parties began seating a new jury. During a break in the selection, the Commonwealth called Detective Frank Mullen, who informed the trial court that he and other detectives went to visit McCorkle's home that morning to look for DeJesus. She told the

officers that she had not seen her son in months and allowed them to search her residence. The detective stated that this visit was the only time officers had actively searched for DeJesus relative to this trial listing. *See* N.T., 10/11/22, at 42. The next morning, the trial court held an additional hearing concerning DeJesus's availability, with Detective Ralph Lewis testifying that he conducted a check of all local hospitals and prisons, state correctional facilities, federal prisons, and the Philadelphia morgue. On cross-examination, Appellant elicited that Detective Lewis was unaware of an open case in the Court of Common Pleas of Philadelphia County relating to DeJesus tampering with an ankle bracelet. The prosecutor followed up on this point, stating that "on September 13th, Eric DeJesus had a court date in this building and I was there on the lookout for him . . . . [but] he did not show up for that court appearance." N.T., 10/12/22, at 9. His failure to appear at that hearing resulted in a bench warrant.

There was no direct testimony presented regarding DeJesus's ankle monitor, but during legal argument Appellant averred that the month after the March 2021 trial was postponed, DeJesus was picked up on another bench warrant and was later placed on electronic monitoring. Appellant argued that the Commonwealth failed to take sufficient steps to locate DeJesus after he "cut his ankle bracelet off . . . July 10th of 2022[.]" *Id.* at 22.

The Commonwealth acknowledged in its responsive argument that DeJesus had been located on April 13, 2021, asserting that he was then "given status dates" to appear in court. *Id*. at 23. The Commonwealth represented

that DeJesus appeared before the court in May and June for those status dates; however, on August 11, "he doesn't show up and a record was made even then."[3] *Id*. at 23. "Eventually, he was found again . . . . That is when the decision was made to place him on house arrest." *Id*. at 24.

Following argument, the trial court noted that DeJesus was released to electronic monitoring on April 5, 2022, and read into the record an email from pretrial services stating that the monitor reported a tamper alert on July 10, 2022. As a result, McCorkle forfeited a $7,500 bond she had posted. *Id*. at 26-27. The trial court deemed DeJesus unavailable, and the Commonwealth introduced DeJesus's preliminary hearing testimony during the ensuing trial.

Having set forth the relevant factual background, we turn to the legal principles that inform our review of the trial court's ruling. A defendant's Sixth Amendment right to confront witnesses against him is "violated by the use of prior testimony unless the prosecution can establish that a good faith effort was made to secure the witnesses['] attendance." *Commonwealth v. Faison*, 305 A.2d 44, 46 (Pa. 1973) (citing *Barber v. Page*, 390 U.S. 719 (1968)). "The length to which the prosecution must go to produce the testimony is a question of reasonableness." *Commonwealth v. Melson,* 637 A.2d 633, 638 (Pa.Super. 1994). We review the trial court's ruling for an abuse of discretion. *Commonwealth v. Wayne*, 720 A.2d 456, 467 (Pa. 1998).

_____

[3] The notes of testimony in the certified record do not include transcripts of status conferences.

The government acts unreasonably when it does nothing to locate a witness. The **Barber** case is one where the prosecution made "no . . . effort" to produce a witness. There, the witness was in a federal prison outside the state's jurisdiction. State officials did not ask the federal government to release the witness for its trial, apparently believing that the request would be denied. The **Barber** Court held that the probability of denial was irrelevant since "the possibility of a refusal is not the equivalent of asking and receiving a rebuff." *Id*. at 724 (citation omitted). "[T]he sole reason why [the witness] was not present to testify in person was because the State did not attempt to seek his presence." *Id*. at 725.

Appellant suggests that this is also a "no effort" case. He cites *Commonwealth v. Lebo*, 795 A.2d 987 (Pa.Super. 2002), as comparable to the present circumstances. In *Lebo*, the defendant was charged with producing obscene materials of underage girls. One of the girls, T.I., had enrolled in a boot camp by the time of trial and the Commonwealth sought to introduce her preliminary hearing testimony. The trial court found that the Commonwealth made a good faith effort to obtain her presence at trial, crediting its statement "that it had learned, two days before [trial], that T.I. was in boot camp[.]" *Id*. at 990. We held that the court erred, as the "Commonwealth did not offer any information regarding whether it had subpoenaed T.I. Without more, we cannot conclude that the Commonwealth made a good faith effort[.]" *Id*. at 991.

Appellant's attempt to characterize the Commonwealth's efforts as non-existent is predicated on a narrow view of the relevant timeframe. Appellant highlights the fact that the government "knew for several months before trial" that DeJesus had cut off his electronic monitor, "yet they did not make any good forth [*sic*] efforts to try and locate him." Appellant's brief at 18. Accordingly, Appellant's substantive argument is that the Commonwealth was required to do more to locate DeJesus during the three months between July of 2022, when he tampered with the monitor, and October, when Appellant's trial took place. "They had three months to look for Mr. DeJesus and yet they decided they weren't going to do anything until Appellant's trial was imminent." *Id*. Appellant suggests that upholding the trial court's ruling "would essentially be sending a message to the Commonwealth that if a bad witness goes missing then they should wait until the last possible moment to begin looking." *Id*.

The Commonwealth, in contrast, does not limit the relevant timeframe to the months between July and October of 2022. Instead, the Commonwealth looks to the entire history of the case. *See* Commonwealth's brief at 14 (citing "the efforts that the Commonwealth undertook prior to the original 2021 trial date"). The Commonwealth describes DeJesus as having "made plain his commitment to 'actively hiding' to avoid testifying," as he had "failed to appear in connection with his own court date the month before trial, forfeiting his bail as a result." *Id*.

Assessing whether the Commonwealth acted reasonably under the circumstances is a fact-intensive inquiry, and in these circumstances, we agree with the Commonwealth that DeJesus's history of avoiding court is relevant to determining the reasonableness of the Commonwealth's attempts to secure DeJesus's presence at the October 2022 trial. The Commonwealth's efforts to locate DeJesus for the first scheduled trial in March of 2021 would be far less probative, and perhaps entirely irrelevant, if the evidence established that DeJesus had simply been unable to be found as opposed to actively avoiding court. However, this is not a case where DeJesus's failure to appear at the first trial listing was due to ignorance of a subpoena. The trial court concluded at the conclusion of the October 12, 2022 hearing that DeJesus "clearly does not want to be present in this courtroom." N.T., 10/12/22, at 25. As the record amply supports that conclusion, the trial court did not abuse its discretion in so ruling.

The fact that DeJesus avoided service for the original trial date is relevant to the probability that he would again avoid court once that trial was postponed. The United States Supreme Court's analysis in ***Ohio v. Roberts***, 448 U.S. 56 (1980), *abrogated on other grounds by* ***Crawford v. Washington***, 541 U.S. 36 (2004), illustrates that a court may assess the probability that the authorities' attempts to locate a witness will succeed in determining whether the Commonwealth's efforts were reasonable. There, the defendant was charged with using stolen credit cards belonging to Anita Isaac's parents. At the preliminary hearing, Anita testified that she knew

Roberts and let him use her apartment while she was out of town but denied defense counsel's assertion that she had given Roberts the credit cards to use. At trial, Roberts took the stand and told the jury that Anita, who failed to appear for trial, had given him her parents' credit cards and checks to use. The prosecution then sought to introduce Anita's preliminary hearing testimony.

The prosecution showed that it had issued "five subpoenas for four different trial dates . . . to Anita at her parents' Ohio residence." *Id*. at 59. Anita's mother, Amy, testified that Anita had left Ohio for Arizona shortly after the preliminary hearing. "About a year before the trial, a San Francisco social worker was in communication with the Isaacs about a welfare application Anita had filed there. Through the social worker, the Isaacs reached their daughter once by telephone." *Id*. at 60. A few months later, Anita called and told her parents that she was traveling. Amy told the court that no one in the family had any means of contacting Anita.

The ***Roberts*** Court concluded that "Anita's unavailability, in the constitutional sense, was established." *Id*. at 74. "[T]he Isaacs and their other children knew of no way to reach Anita even in an emergency." *Id*. Hence, this was "not a case of parents abandoning all interest in an absent daughter." *Id*. The Court acknowledged that the government had at least one lead to pursue, namely the San Fransisco social worker. According to Amy's testimony, the family got in touch with Anita through that worker, which supported a conclusion that the government could have reached out to the

same agency for leads. However, the prosecution was not required to exhaust every possible avenue. "One, in hindsight, may always think of other things. Nevertheless, the great improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution." *Id.* at 75-76.[4]

Returning to the matter before this Court, we conclude that the key aspect is the trial court's finding that DeJesus was avoiding the authorities. The facts show that the Commonwealth made extensive efforts to locate DeJesus prior to the first trial listing. DeJesus's mother refused to give the detectives her son's phone number until ordered by the trial court to do so; the male who answered the phone ignored Detective Marano and did not return his voicemail. DeJesus continued to avoid the authorities and informed the trial prosecutor that he would not attend trial. These efforts establish that DeJesus had no intention of appearing, as corroborated by DeJesus removing his ankle bracelet and failing to appear for his own court dates.

_____

[4] As the United States Supreme Court has stated, "when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness'[s] presence, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." *Hardy v. Cross*, 565 U.S. 65, 71-72 (2011) (citation omitted). The Commonwealth theoretically could have sought to incarcerate DeJesus in lieu of electronic monitoring as a means of compelling his presence. However, Appellant does not argue that the Commonwealth was required to do that to satisfy its good faith obligations, and DeJesus would obviously have his own liberty interests for the trial court to consider.

The consequent question is whether the Commonwealth did enough to look for DeJesus in light of his demonstrated commitment to avoiding court. The probability of procuring the presence of a recalcitrant witness is, by definition, quite low.  Indeed, the **Roberts** Court contrasted the circumstances of that case with those in **Barber**, describing the latter as a case where "the prosecution knew where the witness was, procedures existed whereby the witness could be brought to the trial, **and the witness was not in a position to frustrate efforts to secure his production**."  *Id*. at 77 (emphasis added).

DeJesus, in contrast, clearly sought to frustrate the Commonwealth's attempts to call him at trial.  This is not to say that the Commonwealth could simply presume that DeJesus would fail to honor his legal obligation to appear and do nothing to look for him or otherwise enforce that obligation.  The Commonwealth has tools to enforce compliance, as demonstrated by Detective Marano's testimony that he informed DeJesus he risked incarceration for contempt of court.  Notably, the Commonwealth used one such tool:  it placed DeJesus under electronic monitoring in April of 2022.  This illustrates that the Commonwealth and the trial court were concerned that DeJesus would again disappear and sought to keep tabs on his whereabouts. DeJesus decided to frustrate those efforts by committing a crime, which exposed him to criminal prosecution as well as probation detainers.  The trial prosecutor showed up on DeJesus's court date for tampering with the monitor in an effort to speak to him, but DeJesus failed to appear and another warrant

- 14 -

was issued. Detective Marano visited DeJesus's last known address and spoke with his mother, who confirmed that she had not seen her son in months, which roughly maps to the facts in **Roberts**. We find that the trial court did not abuse its discretion in concluding that the Commonwealth met its burden to establish that DeJesus was unavailable in the constitutional sense.

Having concluded that DeJesus was unavailable, we next address whether Appellant had a full and fair opportunity to cross-examine him at the preliminary hearing. As outlined *infra*, no relief is due.

We have held that "[i]ntroducing statements of an unavailable witness presents issues relating to both the constitutional rights of confrontation as well as evidentiary rules governing introduction of hearsay." **Commonwealth v. Grush**, 295 A.3d 247, 251 (Pa.Super. 2023). The pertinent aspect of the hearsay exception for former testimony applies to statements offered "against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Pa.R.E. 804(b)(1)(B). The viability of this exception "has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement." **Barber**, 390 U.S. at 722. Our Supreme Court requires that the defendant had a "**full and fair opportunity** to cross-examine" the witness at the former proceeding. **Commonwealth v. Bazemore**, 614 A.2d 684, 687 (Pa. 1992) (emphasis in original). Whether a defendant had a "full and fair opportunity" to cross-

examine is a "legal conclusion [which] largely rests on the facts." ***Grush***, 295 A.3d at 252.

Appellant asserts that he was denied a full and fair opportunity because his "attempts to challenge Mr. DeJesus'[s] credibility at the [p]reliminary [h]earing were quickly thwarted by Commonwealth objections and the [c]ourt sustaining those objections." Appellant's brief at 19. He cites seven specific exchanges in which the court sustained the prosecution's objections. The Commonwealth counters that the objections were proper, as the "objections to cross-examination questions were made and sustained because of their form (*e.g.*, needlessly argumentative), or because they had already been asked and answered[.]" Commonwealth's brief at 17.

Appellant takes the "full and fair" pronouncement in ***Bazemore*** to its extreme endpoint, advancing the position that any Commonwealth objection, even if properly sustained by the court, necessarily denied him a full and fair opportunity at cross-examination. He argues: "Even if other instances of impeachment were allowed, the fact is that other lines of questioning were cut off and the law clearly requires a **full** and fair opportunity to cross-examine. If the cross-examination is restricted in any way then we cannot say it was full." Appellant's brief at 24-25 (emphasis in original). Due to this view of the controlling law, Appellant declines to discuss the propriety of the court's rulings. "[T]he question here is not whether the [j]udge at the [p]reliminary [h]earing erred in sustaining the Commonwealth's objections, but whether the

[d]efense was given a full and fair opportunity to cross-examine[.]" *Id*. at 24.

Appellant's failure to explain whether the objections were proper, in conjunction with an argument as to how those objections implicated his right to confront DeJesus, is fatal insofar as he does not address why it would be constitutionally permissible to limit cross-examination at trial upon proper objection but not at a preliminary hearing. Logically, if the questions were objectionable at trial they would be no less so at the preliminary hearing. We thus disagree with Appellant's premise, unsupported by meaningful discussion, that merely sustaining objections automatically deprives the defendant of a "full and fair" opportunity to cross-examine.

Additionally, our caselaw forecloses Appellant's attempt to equate "full and fair" with "completely unfettered." In **Grush**, this Court held that Grush had a full and fair opportunity to cross-examine Jonathan Lubinsky at the preliminary hearing. Lubinsky, who died before trial, "supplied the only testimony linking [Grush] to the homicide," and Grush argued that she was deprived of her full and fair opportunity because she was unaware that Lubinsky was on probation, had pending charges, and had an extensive criminal record of *crimen falsi* convictions prior to the preliminary hearing. We explained that the key consideration was whether this impeachment material was "vital," for if so Grush was denied a full and fair opportunity to cross-examine. We concluded that the material was not vital for the following reasons:

Lubinsky's criminal history, pending charges, and probationary status do not correspond to an unambiguous ulterior motive for Lubinsky to testify apart from his obvious motivation to exonerate himself. Obviously, Lubinsky had every reason to pin the crime on [Grush] as the Commonwealth's evidence suggests that only two people could be responsible for the victim's murder. This could be said to strengthen the case for finding that [Grush] lacked a "full and fair opportunity to cross-examine" in that his credibility is paramount. But the test demands only that: a full and fair opportunity for cross-examination. It does not demand a total and comprehensive cross-examination. Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. Lubinsky's motive to exonerate himself would exist independently of the impeachment material, and cross-examination on that motivation was crucial given his status as the only other plausible suspect. But counsel had a full opportunity to explore, and did explore, that issue at the preliminary hearing.

*Grush*, 295 A.3d at 256–57 (cleaned up).

In the case at bar, Appellant does not address whether any of the proposed lines of cross-examination touched on vital issues.[5] Appellant's

---

[5]   Appellant cites one example as constituting an "incredible point of impeachment that was disallowed[.]" Appellant's brief at 23. DeJesus testified on cross examination that he did not "really remember what actually happened that night. I'm only going off of what y'all explaining to me." N.T., 3/13/19, at 68-69. The following exchange then occurred:

**Q**: Okay.

**A**: Because I done been kidnapped and beaten and all of that. Like, I don't remember nothing.

**Q**: Okay. When you got kidnapped and beaten, was that after the statement or before?

**A**: Yes.

*(Footnote Continued Next Page)*

- 18 -

argument is unconvincing considering his failure to address the fundamental issue regarding whether the objections were proper.

_____

    . . . .

**Q**: So the kidnapping that you endured, you said a kidnapping and a shooting?

**A**: No, I said kidnapping/beating.

**Q**: And a beating.

**A**: And I got stripped.

**Q:** And you got stripped?

**A**: Yes

**Q**: Okay. When did that happen?

**[COMMONWEALTH]**: Objection to the relevance.

**THE COURT**: Sustained.

**[APPELLANT]**: If he's claiming that he doesn't have a memory of this, it seems relevant to ask when this trauma happened.

**THE COURT**: Sustained.  Let's move on, counsel.

Appellant's brief at 21 (quoting N.T., 3/13/19, at 69-73; ellipsis in original). We agree that memory loss is a valid and important line of impeachment. However, to the extent that the judge erred in not permitting further questioning, the significant fact for impeachment purposes is DeJesus's admission that his memory is faulty, not necessarily when the memory loss started.  Counsel was free to argue to the jury that DeJesus's testimony should not be believed given his own admissions.  *Cf. Commonwealth v. Grush*, 295 A.3d 247, 257-58 (Pa.Super. 2023) (concluding that "the impeaching character of the *crimen falsi* offenses is rather minimal when one considers that Lubinsky freely admitted to having a criminal history").  Finally, the court instructed Appellant to move on from the issue of "when" this trauma happened.  There is nothing to suggest that Appellant was foreclosed from other questions, such as who kidnapped and beat DeJesus.

- 19 -

Furthermore, Appellant does not specifically clarify whether he is asserting that his constitutional right to confront DeJesus was violated or whether the Commonwealth failed to establish the evidentiary prerequisites for the Rule 804(b)(1)(B) exception. The *Crawford* decision addressed the introduction of preliminary hearing testimony, stating that "prior trial or preliminary hearing testimony is admissible only if the defendant had an **adequate opportunity** to cross-examine." *Id*. at 57 (emphasis added). In *Bazemore*, which predates *Crawford*, our Supreme Court held that preliminary hearing testimony may only be admitted as substantive evidence if the defendant had a "full and fair" opportunity to cross-examine. Despite the different phrasing, our precedents have treated the *Bazemore* standard as applying post-*Crawford*. *See Commonwealth v. Leak*, 22 A.3d 1036, 1044 n.7 (Pa.Super. 2011). We note that the *Crawford* Court cited, *inter alia*, *California v. Green*, 399 U.S. 149 (1970), for the proposition that preliminary hearing testimony is admissible only if the defendant "had an adequate opportunity to cross-examine." *Crawford*, 541 U.S. at 57. The *Green* decision states that "merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied." *Green*, 399 U.S. at 156.

The two concepts overlap. "Given the similarity of the values protected, however, the modification of a State's hearsay rules to create new exceptions for the admission of evidence against a defendant, will often raise questions of compatibility with the defendant's constitutional right to confrontation." *Id*.

- 20 -

Still, the case for a violation of that right is markedly stronger in a case like ***Bazemore***, where the Commonwealth failed to disclose that the sole witness at the preliminary hearing "had made a prior inconsistent statement . . . and that the [Commonwealth] was, at that time, contemplating" filing charges against the witness for homicide and conspiracy in connection with Bazemore's crime. ***Bazemore***, 614 A.2d at 685. The inability to probe those matters supports a violation of the right to confront one's accusers in a way that the various objections leveled here simply do not.[6] For all these reasons, we conclude that Appellant has failed to show that the trial court erred in admitting the testimony. "It is, of course, an appellant's burden to persuade us the trial court erred and relief is due." ***Commonwealth v. Claffey***, 80 A.3d 780, 787 (Pa.Super. 2013).

Appellant's final claim assails the trial court's denial of his motion for a new trial on weight-of-the-evidence grounds. His argument rests on the unreliability of DeJesus's testimony, which he submits was necessary for the Commonwealth to meet its burden of proof.

---

[6] Indeed, several of the cross-examination questions were clearly objectionable. For example, Appellant complains that the judge sustained the Commonwealth's objection to counsel's remark, "As you sit here today – I mean, you've lied to us today." N.T., 3/13/19, at 73. Counsel also asked DeJesus in response to his testimony that he went around a corner: "Was this a black hole around the corner?" ***Id***. at 44. This sarcastic query was apparently due to counsel's belief that DeJesus's story was not credible. ***See*** Appellant's brief at 23 (agreeing that the question was "somewhat sarcastic," and asserting that counsel "was trying to impeach the witness by questioning him regarding the lack of possibility of what he described").

Our standard of review is well-established:

> A verdict is not contrary to the weight of the evidence because of a conflict in testimony or because the reviewing court on the same facts might have arrived at a different conclusion than the fact-finder. Rather, a new trial is warranted only when the jury's verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. Where, as here, the judge who presided at trial ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

***Commonwealth v. Morales***, 91 A.3d 80, 91 (Pa. 2014) (cleaned up).

Mindful that we are reviewing the trial court's exercise of discretion, and not the underlying claim, we find no abuse of discretion. Appellant's argument rests on his assessment that DeJesus was not a credible witness. However, even setting aside the fact that neither we nor the trial court can simply act as the thirteenth juror and treat our vote as dispositive, ***see Commonwealth v. Widmer***, 744 A.2d 745, 752 (Pa. 2000), Appellant's argument overlooks the surveillance video evidence as well as the locational data from Appellant's cell phone, which confirmed Appellant's presence in the area around the time of the shooting and additionally indicated that Appellant turned off his phone. The trial court concluded that "there was uncontradicted, overwhelming circumstantial evidence presented to establish that it was . . . [Appellant] who committed this murder. Therefore, the verdict did not shock one's sense of justice." Trial Court Opinion, 5/12/23, at 12. The trial court's ruling on the

weight claim is based on a "foundation of reason," **Widmer**, 744 A.2d at 753, and therefore must remain undisturbed.

For the foregoing reasons, Appellant has failed to establish any basis for us to disturb his judgment of sentence. Therefore, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/24/2024